ESTATE OF J. E. O'CONNELL, JAMES O'CONNELL, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of O'Connell v. Commissioner
Docket No. 6907-76.
United States Tax Court
T.C. Memo 1978-191; 1978 Tax Ct. Memo LEXIS 323; 37 T.C.M. (CCH) 822; T.C.M. (RIA) 78191; May 25, 1978, Filed; As Amended July 17, 1978 John R. Kline, for the petitioner. Craig D. Platz, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined a deficiency in the Federal estate tax of the Estate of J. E. O'Connell in the amount of $5,782,238.63. Concessions have been made by the parties. The two issues remaining for decision are: (1) the fair market value of decedent's 400 shares of R. V. Ranch Company stock on April 8, 1973, and (2) the fair market value of decedent's 34,423.5 shares of Capri, Inc., common stock on April 8, 1973. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. The decedent, *324 J. E. O'Connell (hereinafter referred to as decedent), died on October 8, 1972, while a resident of Helena, Montana. James O'Connell (hereinafter referred to as petitioner) is the executor of decedent's estate and, at the time the petition was filed in this case, he maintained his legal residence in Helena, Montana. Petitioner timely filed a United States Estate Tax Return with the District Director of Internal Revenue, Helena, Montana, on July 6, 1973, electing to use the alternate valuation date of April 8, 1973. Facts Relating to Value of R. V. Ranch Company Stock
At the date of decedent's death, there were 500 shares of stock outstanding in the R. V. Ranch Company, a Montana Corporation (hereinafter referred to as R. V. Ranch) of which decedent owned 400 shares. The fair market values of the assets of R. V. Ranch, other than land and improvements, and liabilities on April 8, 1973, were as follows: Cash
$ 4,400
Livestock
135,900
Other current assets
80
Implements and Equipment
2,164
Autos and Trucks
2,829
Prepaids and Deposits
380
Int'l Nickle Shares
41,250
Total Liabilities
(121,077)
At the date of decedent's death, R. V. Ranch owned *325 approximately 12,600 acres of land composed of several noncontiguous parcels separated by a few miles. Half the acreage, located in Lewis and Clark County, is approximately six miles from Helena, Montana. The largest parcel of other acreage is situated just over the Continental Divide in Powell County, approximately fourteen miles from Helena. Lack of contiguity has not been a material problem to the ranch's historical operation as a single unit devoted to the production of beef animals. The parcel of the ranch closest to Helena is known as the Sheridan Ranch. It contains 1,457 acres, of which 128 acres are hay land and 1,329 acres are grazing land. Seven Mile Creek flows through this property and the owners have a third water right of 125 inches. The hay land gets one watering a year. The 128 acres produce 180 tons of hay which is a mixture of alfalfa, brome and timothy. The land is grazed in the spring. A portion of the calving is done here because there is a large log barn for the animals. The Blue Cloud portion of the ranch is located one mile southeast of the Sheridan Ranch. It contains approximately 2,344.75 acres of hillside grazing land in two noncontiguous parcels. *326 There is one spring on the lower portion which has water year round, but Blue Cloud dries up in the summer. This portion is grazed in the spring. The Adami Place and the Cody Ranch parcels together contain 1,879 acres. The Adami Place has 73 acres of hay land which puts up 60 tons of hay. The land is irrigated by Sweeney Creek which dries up in July. The grazing land on this portion is grazed when the cattle come off a Forest Service grazing lease.
The Cody Ranch is south of the highway and it contains 257 acres of irrigated hay land. This hay land grows approximately 180 tons of the mixed hay. This portion has a fourth or fifth water right of 150 inches from Ten Mile Creek, which gives enough water to work only half the acreage, resulting in low production. One half of the calving is done on the Cody Ranch and most of the herd is wintered and fed there.
Six miles west of the main ranch, and in Powell County, there are 6,880.03 acres of grazing and timber grazing land.The Powell County records classify 3,890.47 acres as grazing, 2,944.66 as timber and 45 acres as wild hay land. The 45 acres of wild hay land have not been irrigated or cropped for a number of years since the *327 expense to work it is prohibitive, but it is a good class of grazing land. The cattle operation on the ranch is a "cow-calf business," that is, the calf is born in the spring and sold in the fall. Normal herd replacements are kept. This operation is generally the most profitable where the need for winter hay feeding is comparatively small. On this ranch the winter feed season is approximately five months. The hay land grows 420 tons after which only another one-half ton per acre for grazing purposes remains. This is a limiting factor that necessitates the purchase of supplemental hay to carry the herd and indicates a year-round maximum carrying capacity of 350 animal units. Hay production has been as high as 600 tons from the single annual cutting, and as low as 300 tons. Annual moisture is the controlling factor, the measurements of which vary because of the wide spread in elevation on the ranch. The winter feed stocking rate on the grazing land in Powell County is 5 acres per animal unit month (AUM) [1] and the stocking rate on the timber land is 12 acres per AUM. The stocking rate is 5 acres per AUM on the grazing land in Lewis and Clark County. *328 In addition, the R. V. Ranch has two seasonal grazing permit areas on the Helena National Forest and grazing leases of 240 acres and 40 acres in Powell and Lewis and Clark Counties, respectively. R. V. Ranch operated at an average loss of $7,642 per year during the nine years preceding the valuation date. On the basis of past performance R. V. Ranch will continue to operate at a loss in the future. Helena is the fifth largest city in, and the capital of, Montana. Its radius of 125 miles contains more than 65 percent of the state's population. From 1960 to 1970, the city of Helena and Lewis and Clark County experienced a growth in population of 11.5 and 18.8 percent, respectively, and Powell County experienced a 5.7 percent increase. The growth in population of the state as a whole was 1.08 percent. On the estate tax return and in its petition the petitioner reported a value of $485.33 per share, or a total value of $194,132 for 400 shares of R. V. Ranch stock. In his notice of deficiency respondent determined a value of $1,631 per share, or a total value of $652,400 for the stock. Both parties had expert testimony at trial.Petitioner's expert, William D. Diehl, discounted *329 the net asset value of the ranch yielding a $505.12 per share value.Respondent's expert, Ken E. Joy, computed a $2,081.85 per share value, or a total of $2,081,850. In connection with the preparation of the estate tax return, petitioner employed Murray C. Lind, a qualified expert appraiser, to value the subject property. Mr. Lind determined that the highest and best use of the property as of April 8, 1973, was as a cattle ranch. He valued the land at that date to be $490,000. He based this valuation upon a market data approach of $1,400 per animal unit value and a carrying capacity of 350 animal units. In arriving at a value for the ranch, he choose five sales between 1970 and 1973 that involved cattle ranches. Petitioner employed Dr. Diehl to render an opinion at trial as to the value of the ranch stock. He reviewed Mr. Lind's appraisal and limited his consideration of the subject property value to viewing the premises and adjusting the comparable sales that he thought were inflated "because of liberal financing." Dr. Diehl used Mr. Lind's $490,000 determination of fair market value and discounted the figure to a sum of $362,225 in order to reflect those sales which provided *330 financing for a substantial portion of the sales price. He concluded a per share value for decedent's ranch stock of $505.12, resulting in a total value of $202,048 for the 400 shares owned by the estate. The value determined by respondent in his statutory notice of deficiency was $1,631 per share, or $652,400 for the 400 shares owned by the estate. Respondent employed Jay W. McAfee, an expert appraiser, who determined that, relative to the alternate valuation date, portions of the R. V. Ranch properties would have been considered as having subdevelopment potential. He based this opinion on the sales of fourteen parcels of land relatively nearby the R. V. Ranch properties which had been subdivided and sold in parcels between 1969 and 1974. He then developed an overall dollar-per-acre analysis of those properties by allocating a dollar-per-acre figure to crop land and the grazing land based on sale price and total acreage. He also considered the improvements on the alternate valuation date and valued the ranch at $997,000. Combining that figure with the market values of the ranch's assets not in dispute, Mr. McAfee then determined that the net fair market value of the R. V. *331 Ranch on the alternate valuation date was $1,062,926.He concluded that a willing buyer would have purchased the ranch stock at a price equal to that net asset value. Thus, in his opinion, the decedent's stock would be 80 percent of $1,062,926, or $850,340. For purposes of trial another expert witness of respondent, Ken E. Joy, appraised the value of decedent's stock on the alternate valuation date to be $832,740, representing 80 percent of the ranch's net asset value. He based his opinion upon Mr. McAfee's appraisal of the land and improvements, the stipulated values for other assets and his opinion on the development potential of the property. He did not employ a discount in view of decedent's controlling block of stock. The per share value involved, according to Mr. Joy, was $2,081.85 for the 400 shares owned by the decedent. Lewis and Clark County did not have many cattle ranches sold near the valuation date. There were numerous sales of small tracts for suburban residential sites. There were a few sales of large acreage which were speculative and were subdivided or purchased to hold for future suburban residential sites. In addition, the land in Powell County was more *332 extensively used for agricultural purposes. Facts Relating to Value of Capri Stock
At the date of decedent's death there were 36,123.5 shares of common stock outstanding in Capri, Inc., (hereinafter referred to as Capri) of which decedent owned 95.74 percent or 34,423.5 shares.
Capri is a Delaware corporation with its principal offices in Helena, Montana. When Capri was formed by decedent in 1929, it was primarily an operating company until its operating assets were sold in 1957 with the proceeds being invested in a variety of securities, real estate and subsidiary companies. On the alternate valuation date the liabilities and market value of Capri assets, excluding its interest in its subsidiary Glacier General Assurance Company (hereinafter referred to as Glacier General), were as follows: Cash & Other Current Assets
$ 39,426
Marketable Securities
4,881,291
Real Estate and Other Fixed Assets
601,501
Other Assets
589,907
Investments in Subsidiaries
Milcap, Inc.
834,322
Capri Insurance Company
829,915
Riverside Development, Inc.
102,441
Total Liabilities
(349,147)
Capri wholly owned the Milcap, Inc., and Capri Insurance Company (CIC) *333 subsidiaries; it partially owned Riverside Development, Inc., and Glacier General. The business of three subsidiaries, Milcap, CIC and Riverside, consisted primarily of holding investments in marketable securities or real estate. Milcap, Inc., was formerly Eddy's Bakery Corporation of Havre. At the valuation date, Milcap was involved only in holding ownership of various marketable securities and various properties on which it received rental income. CIC began as an operating life insurance company in 1967. After two to three years of struggling in the life insurance market, the life insurance business was sold to the Life of Montana Company in Bozeman, Montana, a company which turned the business into a fire and casualty company. At the valuation date CIC was not actively engaged in the insurance business and its assets consisted of marketable securities. Riverside Development was originally formed to acquire and develop 750 acres of prime farm land outside Lolo, Montana. It was owned 50 percent each by John Hayden and Capri. Riverside engages in buying, developing and selling real estate properties. On April 1, 1974, Capri sold its 50 percent interest in Riverside *334 to John F. Hayden for $126,000 with no down payment, interest at 7.5 percent payable quarterly, and annual principal payments of $21,000 for six years, July 1, 1976 through July 1, 1982. On the alternate valuation date Capri owned 1,486,200 shares or 74,31 percent of the 2,000,000 total outstanding shares of Glacier General. Glacier General was founded in 1959 by John F. Hayden (hereinafter sometimes referred to as Hayden), who has been its president since inception. It originally had paid in capital of $200,000 and no surplus. It was initially licensed to write workmen's compensation insurance. On December 31, 1962, its Certificate of Authority was amended and since that time it has been a multiple line fire and casualty company which has consistently made an annual profit. Since its founding, Glacier General has emphasized various areas such as products liability, malpractice and reinsurance when conditions were favorable, but has withdrawn from particular areas when unfavorable conditions existed. During 1972, Glacier General began negotiations for an underwritten public offering of its securities to be managed by Drexel Firestone Incorporated (hereinafter referred *335 to as Drexel). In connection with plans for that offering a 200:1 stock split was effected on October 17, 1972. However, by April 2, 1973, Drexel had advised Glacier General that it would not be willing to proceed with the offering. Although the Registration Statement was not withdrawn immediately, Drexel indicated on April 24, 1973, that an offering even in the $15-16 per share range would not be feasible despite the fact that prices discussed earlier were $20 and $26 per share. Factors cited by Drexel in deciding to withdraw were deteriorating stock conditions in February, March, and April 1973, adverse reaction to disclosures regarding substitution of counsel, and negative reactions to the insurance and reinsurance industries arising out of the growing Equity Funding scandal. Glacier General's growth is exemplified by the following financial factors for the years indicated: 1960
1963
1966
1969
1972
Total Assets
$396,000
$1,122,000
$3,107,000
$8,233,000
$25,582,000
Total Liabilities
183,000
606,000
1,820,000
5,120,000
16,763,000
Surplus Certificates
-
-
-
900,000
4,950,000
Capital & Unassigned
Surplus
213,000
516,000
1,287,000
2,213,000
3,869,000
Premiums Written
239,000
1,302,000
3,829,000
10,999,000
21,710,000
Underwriting Gain
10,000
7,000
4,000
80,000
1,059,000
Investment Income
11,000
2,000
68,000
38,000
1,138,000
*336 Glacier General's increased earnings during the five years immediately preceding the alternate valuation date were as follows: 1968
1969
1970
1971
1972
Net Income on stat-
utory basis (as
adjusted by
Montana Ins.
Dept. [1]
$106,000
$ 51,000
$448,000
$1,713,000
$1,512,000
Net Income on
basis of generally
accepted accounting
methods: Glacier General
161,000
230,000
614,000
1,820,000
2,516,000
Subsidiaries
(6,000)
10,000
51,000
196,000
86,000
Total
$155,000
$240,000
$665,000
$2,016,000
$2,602,000
The net asset value attributable to common stock of Glacier General on December 31, 1972, was $3,868,842.25, and the "equity in unearned premiums" [2] on that date was $409,698.50, for a total of $4,278,540.75. On the alternate valuation *337 date, Hayden made the following three-year financial projections for Glacier General based upon projected continuation of business at the $15 million net premium level and earnings sufficient to retire all surplus certificates within three years rather than five years as originally scheduled: Capital & surplus end
of year
$9,926,842.25
$9,896,842.25
$9,826,842.25
Glacier General and Capri entered into a $4.7 million five year (1973-1977) loan agreement with Seattle First National Bank on September 20, 1972. The purpose of the loan was to enable Glacier General to increase its premium business while maintaining a proper relationship between premiums written [3] and policyholder surplus. As collateral for the loan Capri was prohibited, except with the bank's consent, from "paying any dividends on any of its outstanding shares of capital stock, or purchasing or retiring any of its shares, or altering or amending its capital structure, or making any further guarantees of indebtedness of another." In addition, Capri agreed not to sell, transfer, or assign any of its assets. The loan proceeds remained in the bank in the form of certificates of deposit, thus *338 available to repay the loan any time Glacier General or Capri, through its control of Glacier General, wished to reverse the transaction. As a result Capri's holdings were interwoven into the structure and future of Glacier General during the time period the loan transaction remained effective. In connection with the preparation of the estate tax return Michael Flinn was employed by petitioner to appraise the Capri stock. Based upon mutual fund and insurance investment company comparables, he determined the value of Glacier General stock on April 8, 1973, to be $2.1392 per share. Mr. Flinn then concluded that the value of Capri's common *339 stock was 50 percent of its net asset value, or a total of $137.51 per share value. At trial he adjusted that figure to $138.37 per share. Petitioner's second expert, Dr. Shannon Pratt, supported Mr. Flinn's valuation and concurred in the per share value for Glacier General. Dr. Pratt determined the market prices of shares of publicly-traded closedend investment companies comparable to Capri. He then applied a discount for lack of marketability. Finally, he determined a premium the market would place on shares of stock such as Capri for a controlling interest. Using this approach Dr. Pratt determined a $112.82 per share value for Capri stock. The value determined by respondent in the notice of deficiency was $317.02 per share. This amount was later reevaluated at a $316.05 per share value. Mr. Ken E. Joy determined this value by using the net worth multiple of the market prices of public companies he deemed comparable to Glacier General. Applying a 20 percent marketability discount for Glacier General, he determined a $3.09 per share value for the stock. He then added this to the aggregate of Capri's assets and calculated a $316.05 per share value for Capri. Respondent regarded *340 a marketability discount for Capri inappropriate, characterizing the company as a wealthy family holding company. ULTIMATE FINDINGS OF FACTS 1. On April 8, 1973, the fair market value of R. V. Ranch Company stock was $1,131.85 per share. The total value of decedent's 400 shares of R. V. Ranch Company stock on that date was $452,740. 2. On April 8, 1973, the fair market value of the stock of Glacier General was $2.73 per share. The total value of Capri's 1,486,200 shares of Glacier General stock on that date was $4,057,326. 3. On April 8, 1973, the fair market value of the common stock of Capri was $299.75 per share. The total value of the decedent's 34,423.5 shares of Capri common stock on that date was $10,318,444. OPINION The two issues presented for our decision concern the valuation of decedent's controlling blocks of stock in two closely-held corporations, R. V. Ranch Company, a ranching corporation, and Capri, Inc., a holding company. At the time of his death the decedent owned 400 shares (80 percent) in the ranch and 34,423.5 shares of common stock (95.74 percent) in Capri. The parties agree (1) that actual sales prices and bona fide bid and asking prices *341 are lacking with respect to these corporations and (2) that net asset values must be emphasized. They differ, however, as to the valuation of the corporations' net assets, specifically the value of the ranch property and the value of Capri's investment in its subsidiary, Glacier General. It is necessary for us to determine the fair market value on April 8, 1973, of those items in order to ultimately decide the value of the decedent's interest in the stock of the two corporations includable in his estate pursuant to section 2031. [4]
Where, as here, no established market value for stock exists, the regulations provide the following guidelines for consideration: The good will of the business; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange. However, the weight to *342 be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the facts of each case. [Section 20.2031-2(f)(2), Estate Tax Regs.] With these relevant factors in mind, we turn to the valuation of the stock in the two corporations. Issue 1. Value of R. V. Ranch Company Stock
Consistent operating losses of the ranch's cattle business preclude an earnings or dividends approach to the value of the stock. Consequently, the expert witnesses for both parties utilized a net asset value approach. A. Value of Land and Improvements
The value of assets, except land and improvements, and total liabilities of the ranch is stipulated. The parties disagree on the fair market value of the company's land and improvements and the applicability of a discount from net asset value in valuing the stock. The values submitted by the three appraisers were as follows: Murray C. Lind (for petitioner)
$490,000
W. D. Diehl (for petitioner)
362,225
Jay W. McAfee (for respondent)
997,000
Mr. Lind calculated a year-round maximum carrying capacity of 350 animal units, [5] that is, the head of livestock that could *343 be raised on the property, and therefore determined that the highest and best use of the property was as a cattle ranch. Thus, Mr. Lind chose as comparable sales those five parcels of property in the vicinity utilized and recently sold as operating ranches, so as to compare animal units in order to derive a market value for the R. V. Ranch. Petitioner also had Dr. Diehl estimate the value of the ranch stock relative to its underlying assets and reestimate the value of the land and improvements. Basing his conclusions upon actual observations of the ranch and Mr. Lind's report, he adjusted those comparable sales he thought were inflated because of "liberal *344 financing." Respondent's expert, on the other hand, determined that subdivision/development was the highest and best use for part of the property and premised his valuation upon a large number of existing sales of ranch properties, many of which reflected increased increments of value attributable to development potential. The determination of fair market value of the R. V. Ranch requires a finding of fact based on the record before this Court. The evidence persuades us that the market value is $500,000, which is a moderation of the contentions and conclusions of each party. First, with respect to the highest and best use for the property, we agree with petitioner's experts that the utilization of the property as a working cattle ranch is proper. This is based upon the number of working ranches in the vicinity of the property also used for the production of livestock, the lack of change in the traditional operation of cattle raising on the property itself and the agricultural nature of the two counties involved. For these reasons we reject respondent's contention that animal carrying capacity should not receive weight in valuation. Further, we find Mr. Lind's assessment *345 of 350 animal units per year to be reasonable. This method must be tempered, however, by the factor of a likely expansion of a rapidly growing urban area.To that end respondent's fourteen comparable sales merit some consideration. But urban growth is not so overwhelming as to preclude ranching in a wide area surrounding Helena. We think the growth of the urban sprawl around Helena was fledgling during the time of valuation. In our opinion the surrounding lands retained a predominately rural character. Notwithstanding our conclusion of the highest and best use of the land, the five comparable sales relied on by petitioner were too limited to accurately reflect the existing market. However, Mr. Lind's criteria -- property size, disproportionate balance between hay and grazing lands, and noncontiguous parcels -- provide guidelines for value in the best use as a ranch and, accordingly, are given weight. We have also considered pertinent the sale ignored by petitioner in August 1972 of the nearby Green Meadow Ranch, which was subdivided into small acre tracts, and the sale ignored by respondent of the property adjacent to the Blue Cloud portion of the R. V. Ranch which took *346 place on February 23, 1973, for $38 per acre, the price of which partially supports Dr. Diehl's opinion that the Green Meadow property saturated the market for rural homesites. Another factor we considered was that Dr. Diehl did not appraise the property in question, but rather adjusted the comparable sales relied upon by Mr. Lind and then injected substantial "contingent income tax liabilities" in arriving at net asset value. We do not give much weight to Dr. Diehl's "comparable adjustments," explained in his report as follows: Adjustments of comparable sales that are inflated because of liberal financing is a necessity, because "fair market value" is based on market value for cash or a cash equivalent consideration. Acreage sales, in particular, need careful analysis for effects of financing, as it is common for the seller to finance a substantial portion of the sales price and, most probably, to inflate the sales price accordingly. No evidence was presented that Montana ranch sales in general or Mr. Lind's comparables in particular were inflated in price because of liberal seller financing. In contradiction to Dr. Diehl's adjustment for seller financing, Mr. Lind specifically *347 noted in his appraisal report that "terms and/or financing" have not affected the sales price. We also think Dr. Diehl's application of a mathematical formula for discounting Mr. Lind's four seller-financed comparables is without merit. We further disagree with Dr. Diehl's subtraction from net asset value of $39,600 as a "contingent tax liability." In his report he states that the adjustment relates to the cost of liquidating the corporate assets, a factor not relevant to the net asset valuation technique here, considering the nature of the ranching business and lack of any evidence that liquidation was planned or could not be accomplished without tax liability. Estate of Cruikshank v. Commissioner,9 T.C. 162 (1947); see also Gallun v. Commissioner,T.C. Memo. 1974-284. B. Marketability
Dr. Diehl applied a 35 percent discount for "lack of marketability," citing an article by Michael Maher [6] in which prices of freely traded public stock are compared with prices of restricted stock in the same companies, with prices of the latter averaging 35 percent less than the former. *348 We note significant facts which render the discount inapposite in this case. First, there are no publicly traded ranch stocks here from which to draw a comparison. Second, discounts might be applicable when considering minority interests or when there is a lack of marketability, for example, because of a limiting use restriction on the property. See the Maher article and Knapp v. Commissioner,T.C. Memo. 1977-389 (discount in purchase price considered because the Nature Conservatory was a co-tenant, possibly limiting the use of land). We find neither factor present in this case. Here we have an 80 percent majority shareholder with a controlling interest in the ranch. Moreover, the ranch is not an operating business dependent upon the special abilities of the dominant shareholder, a condition which might result in the lack of marketability. Nor do we find any other factor limiting the use of the land. Under these circumstances we believe a discount is inappropriate. As a result we find that the net asset value is market value. Consequently, we hold that the fair market value of the R. V. Ranch stock on April 8, 1973, was $1,131.85 per share, as reflected *349 in our ultimate findings. Issue 2. Value of Capri Stock
Next we must decide the value on April 8, 1973, of 34,423.5 shares of common stock of Capri owned by decedent at his death. On that date there were 36,123.5 common shares outstanding.The parties agree to the fair market value of all of Capri's assets, except for the value of Glacier General, and to the amount of Capri's liabilities on the alternate valuation date. Two issues are in dispute. The first is the fair market value of 1,486,200 shares of the Glacier General subsidiary owned by Capri. There were 2,000,000 shares outstanding. Petitioner claims a $2.13 per share value of the Glacier General stock as opposed to respondent's determination of a $3.09 per share value for the stock. The second issue is the fair market value of the decedent's interest in Capri's aggregate holdings. Petitioner claims a $112.82 per share value of the Capri stock and respondent claims a $316.05 per share value. The Court is thus faced with a large discrepancy as to the final value of the Capri stock.
Both parties accept Glacier General's net worth of $4,278,540.75 on December 31, 1972. Petitioner's experts, Michael Flinn and *350 Dr. Shannon Pratt, used closed-end investment company comparables.[7] Mr. Flinn concluded that the value of Capri's common stock was 50 percent of its book value. [8] He based this discount on comparison with insurance holding companies, which were selling at discounts from liquidating value of up to 50 percent, and with closed-end mutual funds, which were selling at discounts from net asset value of up to 58.8 percent. *351 Dr. Pratt determined that the fair market value of 100 percent of Capri stock on April 8, 1973, was $4,056,489. He calculated a fair market value on the alternate valuation date of the 95.74 percent interest held by the decedent of $3,883,587, or $112.82 per share, arrived at as follows: Underlying net asset value of 100% of Capri,
using market values of assets as of April,
1973, and without reflecting tax liability
for unrealized capital gains:
$9,949,935
"Publicly-traded equivalent" value of the
shares of stock, on the basis of the
percentage of underlying net asset value
at which comparable publicly-traded closed-
end investment companies sold on the market
as of April, 1973: 56% X $9,949,935 =
5,571,964
Discount for lack of marketability: 35%
65% X $5,571,964 =
3,621,776
Premium for controlling interest: 12%
112% X $3,621,776 =
4,056,389
Percent of total owned by estate: 95.74%
95.74% X $4,056,389 =
3,883,587
$3,883,587 / 34,423.5 shares = $112.82 per share The executor, James O'Connell, and Glacier General's president, John Hayden, testified that this procedure is a "standard business formula" for the insurance industry. Respondent's *352 witness, Ken E. Joy, reviewed the market prices of stocks of small property-liability insurance companies traded in the over-the-counter market and compared Glacier General to several publicly owned insurance companies. He used a net worth multiple of the market prices of several public companies. He calculated this sum by taking the selling price of a number of publicly held corporations and the acquisition price of others as a multiple of their statutory net worth. He then averaged the result and applied the ratio obtained to Glacier General's statutory net worth on December 31, 1972. Because of limited marketability he applied a 20 percent discount and ascertained a $3.09 per share value for Glacier General stock. Having determined the only variable in Capri's assets, Mr. Joy then computed the net asset value of Capri at a $316.05 per share value without regard to any additional discount for Capri stock. To substantiate his method of valuation for Capri, petitioner characterized Capri as a 'heterogenous melange of operations and investments of unique character,' and described the Glacier General subsidiary as a unique closely held corporation in the insurance industry which *353 is not comparable to any other insurance company. In his valuation report Mr. Flinn based his valuation on the following factors: (1) that the insurance industry had been volatile; (2) that Glacier General had a limited history in the reinsurance industry and had not established any prior reserve in anticipation of unfavorable underwriting results; (3) that Glacier General, was basically a "one man" company; (4) that it was controlled by the Insurance Commissioner of the State of Montana; (5) that a public offering failed; (6) that the general stock market was in a down trend; and (7) that the Equity Funding Scandal was coming to light and affecting the sales of insurance stock. Respondent, on the other hand, represented Capri as essentially a holding company of the wealth accumulated by the decedent during his lifetime, with decedent owning more than 95 percent of its stock at his death. Respondent determined that the fair market value on the alternate valuation date of assets owned outright by Capri exceeded $6 million, of which more than 80 percent was represented by cash and marketable securities, and that the fair market value of its interest in its other subsidiaries, excluding *354 Glacier General, exceeded another $1.7 million, with the greatest part of the assets in the non-operating subsidiaries again being represented by cash and marketable securities. It is respondent's contention that Glacier General represented Capri's only operating subsidiary. When the market value of corporations engaged in the same or similar business is considered in evaluating the stock of a closely-held company, the question invariably arises as to the degree of comparability of the particular corporations chosen. Here petitioner's experts utilized a formula approach for closed-end mutual funds and insurance holding companies, while respondent's expert valued and compared publicly held insurance companies. The disparity produces definite limitations on both sides which leads us to a conclusion that a more accurate fair market value for Glacier General stock is $2.73 per share. We also find the net asset value of Capri stock is the inclusion of this only variable into the calculation of its net assets without allowance for a discount. We reach this conclusion based on several factors, none of which can be applied with mathematical precision Instead, the unique facts of each *355 case must be weighed and considered in an effort to avoid the infusion of "a talismanic precision" into an area which should frankly be recognized as inherently imprecise. See Commissioner v. Marshall,125 F.2d 943, 946 (2nd Cir. 1942); Messing v. Commissioner,48 T.C. 502, 512 (1967). As a threshold matter, we reject respondent's assertion that the insurance holding companies used by petitioner are not really comparables. Although we note the distinction between the purpose for which the two organizations were formed, we find it pertinent that those particular holding companies were utilized because they were similarly diversified and had a significant portion of their assets in investments other than readily marketable securities. There are, however, sufficient differences between Capri and a closed-end investment company to warrant an adjustment to petitioner's determination of stock value. It is as this point that the underlying purpose of closed-end companies weighs against petitioner: Capri has a small number of shareholders with no apparent intention to distribute any benefits to a larger number; whereas a closed-end investment company *356 provides a large number of investors with the opportunity to participate in a portfolio of securities under professional management. Also, Capri has a higher concentration of assets in Glacier General than one would normally find in one portfolio company of a closed-end investment company. However, Capri is an established company with a consistent record of earnings that lacks the greater risk, venture type situation of some of the closed-end investment companies used as comparables. Capri also has an element of control through stock ownership that is absent in the case of many public market transactions of the closed-end investment companies. It is this last contrasting factor which weighed against petitioner in our final conclusion as to value. We are not convinced that the decedent's 95 percent controlling interest in the stock was given sufficient consideration by petitioner. Mr. Flinn's comparison of mutual fund companies, which were selling at discounts from net asset value of up to 58.8 percent, represented only minority interests, as did the insurance investment companies, and we disagree with his assessment that a "majority interest would likewise sell at similar discounts, *357 " without adequate substantiation of that conclusion. We are similarly unconvinced that the approach utilized by Dr. Pratt in his appraisal of Capri made sufficient allowances for the decedent's controlling interest. In analogizing Capri to closed-end investment companies, Dr. Pratt discounted Capri's net asset value (including its interest in Glacier General based on its net asset value) by 56 percent to represent the "unique character" of Capri. He then added a 12 percent premium to account for the discrepancy between the minority interest sales data he employed and the decedent's controlling interest. Because these companies were publicly traded, he applied a second discount of 35 percent for lack of marketability. This approach might be applicable for minority stock interests, see Estate of Heckscher v. Commissioner,63 T.C. 485 (1975), but here we are valuing a 95 percent majority interest where recognition of the asset value is crucial to any purchaser who, having effectively acquired the company, has an obvious interest in the net worth that is beyond the interest in the security.This means that the valuation of that interest should reflect the company *358 which is effectively being acquired and that value in turn will reflect the marketability of the underlying stock. The 12 pecent premium added by Dr. Pratt to account for the controlling interest of the stock does not adequately reflect the marketability of the underlying stock of Glacier General. As we previously noted, the figure to which the premium was added was based on minority interest sales, thus providing a false foundation initially Also, the premium was based upon tender offers where there would be no ability to realize any greater value for that stock than through a public market. As respondent's expert, Mr. Joy explained: You have in a tender offer situation, public shareholders who have the alternative of selling their stock in a public market. You have a buyer interested in purchasing and acquiring a controlling interest. Those public shareholders do not have the underlying ability to realize any greater value for that stock than through the public market. For example, if the liquidating value of the corporation were $20.00 and the public market were $12.00, then if a tender offer were put in at $15.00, then those shareholders would likely sell. That does not, *359 however, indicate to me that a controlling shareholder who would, for example, in the simple case, have the alternative of realizing $20.00 would sell for the $15.00 value. The problem, therefore, in using tender offers as a guideline in determining a premium for a controlling interest is that it starts again with a public shareholder holding no more than a minority interest in the stock. In addition to the lack of consideration for controlling interest, we find the underlying concept of petitioner's "industry wide formula" troublesome. Petitioner asserts that the value of Glacier General stock was based upon prior transactions by the company in which a formula price was used. This formula added equity in unearned premium to policyholders' surplus. We note, however, that the prior transactions relied upon at formula were between related parties or involved acquisitions of a noncontrolling interest from a seller under compulsion to sell or prices contractually dictated under a buy and sell agreement. They were also made at a time when Glacier General was a new, undercapitalized company writing only a single line of insurance and having no established history of earnings as a *360 going concern. Moreover, Mr. Hayden conceded on cross-examination that the formula provided a starting point in sales negotiations, the price of which included other factors such as earnings. Nor is there evidence in the record of any consummated sales of controlling interests in privately held insurance companies utilizing this formula. We therefore find an insufficient basis to adjust the value of Glacier General's net asset value based upon application of this formula approach. To the contrary, respondent used a capitalized earnings approach that reflected an earnings base premised upon 1972 figures. Mr. Joy. used both the projected earnings figures of Hayden and his own comparables to determine that those companies would have substantially increased earnings revenues in future years. Petitioner attacks this method as contrary to respondent's own guidelines, which recommend an evaluation of stock by considering earnings capitalization based upon a five-year average earnings.See Rev. Rul. 59-60, 1959-1 C.B. 237. Considering the general economic conditions on the alternate valuation date, there was a credible justification for utilizing a 1972 base. A surge of *361 economic activity during the end of 1972 forecasted continued growth in 1973. But rising credit demands, along with the higher rates of inflation, were expected to result in higher interest rates. Moreover, stocks, dropped during the first quarter of 1973. Notwithstanding favorable projections for future earnings, however, we think the earnings base used by respondent was somewhat inflated. Further, as we stated previously, we find petitioner's comparables pertinent to a determination of value. As a result it is only by analyzing the relative selling prices of all similar stock used by both parties that we are able to gauge with some degree of realism the probable range of values at which a willing buyer would buy and a willing seller would sell. In the ultimate determination of value, the discussion of decedent's controlling interest and stock valuation method does not negate a discount based upon lack of marketability, a concept which is premised upon the absence of an existing market for the shares. The principle is well stated in Central Trust Co. v. United States,305 F.2d 393, 405 (Ct. Cls. 1962) as follows: It seems clear, ***, that an unlisted *362 closely held stock of a corporation *** in which trading is infrequent and which therefore lacks marketability, is less attractive than a similar stock which is listed on an exchange and has ready access to the investing public. Using this rationale petitioner maintains that a marketability discount should apply for both the Capri and the Glacier General closely held stocks. Respondent concurs with a marketability discount for Glacier General only. Mr. Joy assigned a 20 percent discount to the stock. He based the percentage upon the Montana Insurance Examination adjustments to Glacier General's 1972 earnings and net worth, which caused a 40 percent reduction from figures presented in support of the proposed public offering. Since the public offering did not occur, Mr. Joy took into account the lack of marketability that continued to exist with respect to Glacier General shares.
Petitioner's comparables were based upon minority interests in which a discount had already been considered in determining value. Furthermore, petitioner's reliance on Glacier General as basically a one-man company that would restrict marketability is slightly distorted. Glacier General began to phase *363 out the reinsurance business in 1971. Although Mr. Hayden is an integral part of Glacier General, his relationship principally related to the reinsurance aspects of the business which had been substantially phased out on the alternate valuation date. We think the failure of Glacier General's public offering is indicative of restrictions warranting more than a 20 percent discount. Considering Mr. Joy's comparison of the relationship between market prices of similar public companies on April 8, 1973, and the values discussed as possible offering prices for Glacier General, it is clear that deteriorated market prices prevented a public offering at that time, and that the stock value of all companies would similarly be reflected by the decline. Consequently, the $2.73 per share value for the stock of Glacier General on April 8, 1973, reflects a 30 percent discount for lack of marketability. We turn now to the question of a discount for the Capri stock. Respondent maintains that no marketability discount is appropriate for Capri because (1) it would represent a discount from the net fair market value of Capri's assets already reflecting a marketability discount; (2) it would assume *364 a nonexistent public market quotient from which to discount Capri's marketability; and (3) it is inappropriate because the decedent had a controlling interest in Capri stock. Respondent argues that even in closed-end investment companies sales of controlling interests are made at net asset value without discount. A discount for lack of marketability is not automatic. There is no official authorization for a lack of marketability discount in the regulations or published rulings. The final decision, therefore, is a matter of discretion in this case that lies with the Court. Although we consider petitioner's comparables to have merit in determining value, we agree with respondent that no further discount is appropriate for several reasons. First, the decedent was a majority shareholder having a controlling interest in Capri. As such, one of the reasons for a discount, that of minority interest, is lacking. Second, the two companies Mr. Flinn used to represent sales of controlling interests at a substantial discount are not comparables, a fact which he concedes, but are used solely to demonstrate that large discounts can be applied to majority stock positions. Without any *365 evidence on the comparability of those two companies with Capri, we find petitioner's point conclusory and thus invalid even for the limited purpose submitted. Third, we do not find the loan relationship between Glacier and Capri indicative of restrictions that limit marketability. In this respect, Dr. Pratt's tender offer data yielded an average premium of 28 percent but was reduced to 12 percent because of "the extensive restrictions on the prerogatives of control in connection with Capri." Primary reference of these restrictions were to $4.7 million surplus certificates issued by Glacier General to its president and minority shareholder, John Hayden, the financing of which was obtained from a bank and guaranteed by Capri. Dr. Pratt reasoned that the normal prerogatives of control were not avilable because Capri could not pay dividends and pledged all of its assets and those of its subsidiaries as collateral for the loan. Respondent maintains that the loan was a paper transaction to achieve the sole objective of Glacier General's further expansion of business. He points to the fact that the money remained at the bank and earned interest at a cost differential to Glacier General *366 of only 2 percent for the loan. It is respondent's theory that the transaction could have easily been reversed through Capri's controlling interest in Glacier General, "thus removing the self-imposed 'restrictions' considered critical by Dr. Pratt." We agree with respondent and find that substance prevails over form. The loan conditions in reality did not provide critical restrictions at an extreme cost to Capri in the event Glacier General did not succeed. The funds were deposited and readily available, accuruing interest that was offset against the loan interest, resulting in a low risk factor that would not critically inhibit the marketability of the stock.
Fourth, Glacier General is Capri's principal operating subsidiary. Since we have already provided for a discount with regard to Glacier General's closely-held stock, the result of an additional discount for the aggregate assets of Capri, which are primarily investment holdings not subject to discount, would in effect only increase the discount previously designated to Glacier General. Assuming no other reason to discount the stock, we reject such an inflated reduction. Although it is clear that any buyer of Capri stock *367 would be attracted by one particular asset, that of Glacier General, we find that factor minimal in comparison with the weight of other factors considered. Consequently, we do not find a discount for Capri appropriate. Accordingly, upon consideration of all of the evidence, we have found that the fair market value of Capri's common stock on April 8, 1973, was $299.75 per share and that the value of the decedent's 34,423.5 shares of Capri common stock on that date was $10,318,444. To reflect concessions by the parties and our conclusions on disputed issues, Decision will be entered under Rule 155.
Footnotes
1. The animal unit (AU) is usually termed as "a mature beef animal or range cow, with or without unweaned calf at her side", or as a 2-year old steer, weighing 1,000 pounds or more. Regardless, the connotation of this terminology is the same in practice; the starting point is a decimal equivalent of 1.00 for mature animals. If a 1,000 pound animal is equal to 100% of one animal unit, then a yearling heifer, for example, weighing 500 pounds, is equal to 50%, or is 0.5 AU, and a short 2-year old steer weighing 750 pounds would be equal to 0.75 AU. An animal unit month (AUM) is defined as the quantity of feed needed for good growth or sustenance by 1.00 AU for one month. It is further defined as furnishing 400 pounds of total digestive nutrients, and is equivalent in feed value to 800 pounds of average quality hay.The term AUM is actually a formula, which reads as follows: A X U X M = AUM in which: A = number of head of livestock U = the size of the animal by decimal equivalent M = the number of months involved Carrying capacity is defined as the number of animal units (AU's) estimated that a given ranch unit will carry the year-round, based on analysis of productive capabilities of the land in terms of feed and forage, feed requirements, and assuming good management of the real estate and natural resources.↩
1. The March 16, 1973, examination report by the Montana Insurance Department included a $2.3 million reduction in Glacier General's reported policy-holder surplus as of December 31, 1972, primarily due to an increase in required loss reserves.↩
2. "Unearned premiums" is the total amount held by the insurance company which has been prepaid for risk protection in a future period.↩
3. The basic source of revenue in the property-liability insurance industry is premium volume. "Direct premiums written" is the total amount of insurance originated by the company during the period (year, quarter, or month), whether the premiums are collected by the end of the period or not. This figure is before all reinsurance transactions. "Net premiums written" is direct premiums written, plus reinsurance assumed from other companies, less reinsurance ceded to other companies. It is a cash figure and does not represent premiums accrued.↩
4. Unless specified otherwise, section references are to the Internal Revenue Code of 1954 as amended and in effect for the year in issue.↩
5. Mr. Lind explained that the animal unit is the yardstock most commonly used in cattle ranch appraisals to relate prices paid, carrying capacity and rental charges. Historical techniques for cattle ranches have tended to disregard the ranch house and corral building to a large extent because their percentage of value contribution to the entire ranch is very low. In Mr. Lind's appraisal the value contribution of the structural improvements was segregated and the value of the land improvements was included in the land.↩
6. M. Maher, Discounts for Lack of Marketability for Closely Held Business Interests,1976 Taxes 562↩.
7. Investment companies fall into several classes.The open-end investment company, sometimes called the Mutual or Boston type, is characterized by the continual issuance and/or redemption feature of its capital stock. Stockholders may at any time, and at their option, redeem their shares at the the asset value of the stock, less a slight discount. The bid price for the stock is, in effect, maintained at a level close to its asset value. Closed-end investment companies, on the other hand, have no such stock redemption provision and operate in the conventional corporate manner of having set amounts of capital stock issued at a given time. These companies are further classified as leverage or nonleverage. In leverage companies (i.e., companies with one or more issues of securities senior to the common stock) the asset value and market value of the common stock may depend more on the amounts of senior capital outstanding than on the investment activities. ↩
8. It appears that "book value" as used by Mr. Flinn in his report was intended to mean net asset value at market.↩