MORRIS M. MESSING, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ESTATE OF HELEN F. MESSING, DECEASED, MORRIS M. MESSING, EXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5865–65, 6295–65.    Filed June 29, 1967.

*Herbert Burstein* and *Arthur Liberstein*, for the petitioners.
*Eugene S. Linett*, for the respondent.

TANNENWALD, *Judge:* Respondent determined gift tax deficiencies for 1961 in the amounts of $125,029.47 and $56,435.30, respectively, for Morris M. Messing (hereinafter referred to as petitioner) in docket No. 5865–65 and Helen F. Messing, deceased, in docket No. 6295–65.

After concessions made by petitioners, there remain for our decision the following issues:

(1) What was the value of 26,400 shares of common stock of Sel-Rex Corp. gifted by petitioner on September 13, and 16, 1961?

(2) Did petitioner make a taxable gift under section 2512(b) [1] to his son Robert on September 13, 1961, when he sold 10,000 shares of common stock of Sel-Rex Corp. to Robert for $100,000?

(3) Were gifts by petitioner to his grandchildren in 1961 entitled to the $3,000 annual exclusion as gifts of present interests under section 2503?

(4) Were gifts made by petitioner to his minor children in 1958 and 1959 entitled to the $3,000 annual exclusion as gifts of present interests under section 2503?

### FINDINGS OF FACT

Some of the facts are stipulated and are found accordingly.

Morris M. Messing and Helen F. Messing, deceased, the individual petitioners in the two dockets here involved, were husband and wife with their legal residence in South Orange, N.J., at the time of the filing of the petitions herein.[2] The Federal gift tax returns for the calendar year 1961 and the prior years 1958 and 1959, together with the consents as required by section 2513, were filed with the district director of internal revenue at Newark, N.J.

Sel-Rex Corp. (hereinafter referred to as Sel-Rex) was organized on January 2, 1951, as a New Jersey corporation under the name of Sel-Rex Precious Metals, Inc. Its name was changed to Sel-Rex Corp. on November 7, 1956.

Since the date of its incorporation and at all relevant times, Sel-Rex has been engaged in developing and marketing patented precious

---

[1] All references are to the Internal Revenue Code of 1954.

Respondent raised this issue for the first time in his amended answer and therefore has the burden of proof with respect thereto. Rule 32, Tax Court Rules of Practice.

[2] Helen died subsequent thereto; Morris was named the executor of her estate on June 9, 1966, and was substituted as petitioner in docket No. 6295–65 by an order of the Court dated Sept. 28, 1966.

metals electroplating compounds and processes. It has also conducted precious metals refining operations and developed, manufactured, and sold equipment for the electrodeposition of precious metals for use in industry. The principal industrial uses of the Sel-Rex products and processes have been in the fields of data processing, missiles, spacecraft, aircraft, chemicals, and transistors and other semiconductors. Its products and services have been adopted for various applications in a reasonably wide range of electronic devices.

At all material times, Sel-Rex had a reputation of being a well-managed leader in its field.

The original authorized capital of Sel-Rex was 5,000 shares of common stock without par value but was changed to 2,100,000 shares on June 26, 1961. On October 26, 1956, petitioner acquired all of the issued and outstanding stock of Sel-Rex and became its principal executive officer. Between October 26, 1956, and June 29, 1961, the total issued and outstanding stock of Sel-Rex consisted of 1,200 shares, of which petitioner owned and held 1,195. The remaining 5 were held by three directors as qualifying shares.

As of the following dates and times, the following number of shares were issued and outstanding:

| | Total shares outstanding |
| --- | --- |
| 1951 to June 29, 1961 | 1,200 |
| June 29, 1961 (420 for 1 split) | 504,000 |
| June 30, 1961 (3,333 shares issued) | 507,333 |
| Sept. 21, 1961 (5 for 3 split) | 845,555 |
| Jan. 10, 1962 (33,000 shares issued) | 878,555 |

In 1961, approximately 36 customers provided 80 percent and 7 customers accounted for approximately 44 percent of the gross sales of Sel-Rex.

During 1960 and the first half of 1961, over 80 percent of Sel-Rex's net sales were attributable to sales of gold-electroplating products. For the same periods, more than three-fourths of the sales of gold- electroplating products consisted of compounds for use in "Sel-Rex Processes," i.e., gold-electroplating processes developed and patented by Sel-Rex.

Based on 845,555 shares outstanding, the book value per share of Sel-Rex was $2.23 as of June 30, 1961 and $2.70 as at December 31, 1961. Its working capital ratio was 1.9 to 1 on June 30, 1961, and approximately 4.58 to 1 on December 31, 1961, the latter increase being attributed to the conversion of $1 million from short-term to long-term debt on September 13, 1961, at an interest rate increased from 4¾ percent to 5¾ percent.

Consolidated net sales and net earnings of Sel-Rex and subsidiaries were as follows for the following years and periods:

| Year ended Dec. 31— | Net sales | Net earnings (after taxes) | Net earnings per share based on 845,555 shares outstanding |
|---|---|---|---|
| 1956 | $5,698,527 | $96,061 | $0.11 |
| 1957 | 7,095,525 | 139,801 | .17 |
| 1958 | 6,197,732 | 104,361 | .12 |
| 1959 | 9,684,867 | 294,281 | .35 |
| 1960 | [3] 13,422,282 | 485,093 | .57 |
| 1961 | 1 17,639,000 | 817,000 | .97 |
| Six months ended June 30— | | | |
| 1960 | 6,350,701 | 239,578 | .28 |
| 1961 | 9,283,788 | 416,104 | .49 |
| Five months ended Nov. 30— | | | |
| 1961 | 1 6,987,818 | 272,042 | .32 |

1 Approximate.

In September 1961, Sel-Rex held approximately 49 patents and had applied for 106 patents, both foreign and domestic. These patents covered various processes and electrolytes used in precious metals electroplating. Of these, 5 were important in that they were so-called basic patents. None of the patents had been tested by litigation. Patent infringement suits involving chemical patents are frequent occurrences. The patents held by Sel-Rex were vulnerable to modification and to developments which were outside the range of its processes.

In 1961, the science and technique of gold electroplating was part of an expanding technology. Competitors of Sel-Rex were filing applications and obtaining patents for precious metals electroplating; there were substitutes for gold in the industrial areas where the Sel-Rex patented processes were employed; and it was thought that miniaturization in the electronics field could result in reducing the application and use of gold.

On June 15, 1961, following negotiations which commenced in November 1960, petitioner sold to Wertheim & Co., a prominent New York financial firm, 60.4 shares, or approximately 5 percent, of his stock of Sel-Rex for $250,000. Wertheim had, on prior occasions, made investments in closely held corporations. The price was determined on the basis of an original valuation of Sel-Rex by Wertheim of $4,500,000 and agreement between the parties on a $5 million valuation in December 1960. The sale of the stock was subject to limitations and restrictions under a written agreement dated June 15, 1961, between petitioner and Wertheim. The pertinent limitations and restrictions gave Sel-Rex and petitioner a right of first refusal in the event of a proposed sale by Wertheim and also required Wertheim either to sell its shares with petitioner, if petitioner decided to sell, or resell its shares to petitioner

3 Sales in 1960 and 1961 included more than $2 million of nonrecurring sales to a domestic licensee who had suffered a disastrous fire.

for $250,000. This latter restriction was to remain in effect only so long as petitioner retained all his remaining shares. In the agreement, Wertheim represented that the acquisition of Sel-Rex shares was being made for investment purposes.

Computed on the basis of 507,333 shares outstanding and on the number of shares actually received by Wertheim, the price paid by Wertheim was $9.80 per share.

The acquisition of Sel-Rex shares by Wertheim was the result of arm's-length bargaining and was unrelated to Wertheim's obligation to render financial advice to Sel-Rex under an agreement dated February 1, 1961, which provided for compensation to Wertheim of $10,000 per year and that one of the Wertheim partners, Malcolm K. Fleschner, would serve as a director of Sel-Rex.

The following other transactions involving Sel-Rex stock (based on 507,333 shares outstanding) took place:

(a) In June 1961, 10,000 shares were purchased by Lucien R. Collart, secretary-treasurer and a director of Sel-Rex, for $10 per share.

(b) On June 30, 1961, Rene J. Rochat and Edwin C. Rinker exchanged their shares of Sel-Rex, S.A., a Panamanian corporation, for 3,333 shares of Sel-Rex at $6.90 per share. Prior to that date, petitioner had owned 80 percent and Rene J. Rochat and Edwin C. Rinker, respectively, 5 percent and 15 percent of the issued and outstanding capital stock of Sel-Rex, S.A.

(c) In September 1961, 2,000 shares were purchased by Herbert Burstein, a director of Sel-Rex, for $10 per share.

(d) In September 1961, 1,000 shares were purchased by Eugene J. Habas, a director of Sel-Rex, for $10 per share.

The exchange and all of the foregoing sales were made at arm's length. At the time they occurred, the stock of Sel-Rex was not registered under the Securities Act or any other law and was not publicly traded. Nor was there any agreement with any banker, underwriter, or any other person for the sale or other disposition of the stock of Sel-Rex.

On September 13, 1961, Robert H. Messing, petitioner's son, purchased 10,000 shares for $10 per share, a transaction which is in issue herein.

The price of $10 paid by Collart, Herbert Burstein, Eugene J. Habas, and Robert H. Messing was based upon the price paid by Wertheim.

On January 10, 1962, a public offering of 200,000 shares of Sel-Rex stock was made through a group of underwriters acting through Eastman Dillon, Union Securities & Co. The underwriters acquired 167,000 shares from petitioner and 33,000 shares from Sel-Rex.

The preliminary registration statement under the Securities Act of 1933 was filed with respect to the anticipated public offering on September 27, 1961. The proposed maximum offering price per share stated therein, estimated solely for the purposes of calculating the registration fee, was $25 per share. The registration statement became effective on January 10, 1962. The public offering price was fixed on that date at $22 per share, of which $20.50 went to petitioner and Sel-Rex. The offering was oversubscribed and the stock was bid as high as $29 per share on that date. Through March 30, 1962, Sel-Rex stock was bid as high as 37¾ and as low as 27½. The offering price of $22 per share, adjusted to reflect the lesser number of shares of Sel-Rex issued and outstanding during September 1961, was $36.66 per share.

Eastman Dillon, Union Securities & Co. had first been approached about a public offering of Sel-Rex stock in the first week of September 1961. At that time, the possibility of a public offering price of approximately 20 times anticipated 1961 earnings was discussed. Between September 15, 1961, and January 10, 1962, the stock market was relatively stable.

During September 1961, when 507,333 shares were issued and outstanding, petitioner made the following gifts of Sel-Rex stock:

(a)  On September 13,   600 shares to his son Robert;

(b)  On September 13,   600 shares to Helen as custodian for Gilbert Scott, his minor son;

(c)  On September 13,   600 shares to Helen as custodian for Madeline Ivy, his minor daughter;

(d)  On September 13,   600 shares to Helen as custodian for Andrew, his minor son;

(e)  On September 16,   24,000 shares to a certain trust created by a trust agreement of that date.

Petitioner valued the shares of Sel-Rex gifted in 1961 at $10 per share. Respondent, in his deficiency notice and in his amended answer, in which he claimed an increased deficiency with respect to the sale to Robert Messing, asserted a value of $30 per share.

During 1961, petitioner made the following gifts for the benefit of two minor grandchildren:

| Beneficiary | Gift | Date of gift | Amount of gift (sec. 2512(a)) |
|---|---|---|---|
| Robin May Messing | Cash | Mar. 21 | $1,000.00 |
| | Bond | Apr. 13 | 2,431.84 |
| | Cash | Dec. 12 | 2,000.00 |
| Bonnie Lynn Messing | Cash | Mar. 21 | 1,000.00 |
| | Bond | Apr. 13 | 1,621.23 |
| | Cash | Dec. 12 | 2,000.00 |
| Total | | | 10,053.07 |

The checks were payable to the order of, and the gifted bonds were registered in the names of, Robert and Norma Messing (the beneficiaries' parents) "I/T/F" (in trust for) the beneficiaries. No formal trusts were created with respect to these gifts.

On December 26, 1958, petitioner, as settlor, created three trusts, one each for the benefit of his minor children, Gilbert Scott, Madeline Ivy, and Andrew.

Under the indenture creating these trusts, the trustees (petitioner and Helen) could, in their joint discretion, apply so much of the net income of each trust (and any accumulated income) to the support, education, medical care, and maintenance of the beneficiary as they saw fit during the beneficiary's minority. Income not so applied was to be accumulated. The trustees could also at any time pay over so much or all of the principal of each trust to the beneficiary during minority as they in their absolute discretion deemed advisable. When a beneficiary reached the age of 21, all accumulated net income and the then principal of the trust were to be distributed to the beneficiary and the trust was to terminate. If a beneficiary died before reaching age 21, all accumulated income and principal were to be paid to the beneficiary's surviving issue or, if there were no such issue, to the beneficiary's estate. In each of the years 1958 and 1959, petitioner made gifts in the value of $6,000 to each of these trusts, or a total of $36,000 for both years.

OPINION

<em>I</em>

The principal issue herein involves the determination of an oft-litigated and plaguingly elusive question of fact—what was the value on a given date of gifted shares of stock, representing a minority interest in a closely held corporation whose shares were not being publicly traded at or about the time of gift? Not surprisingly, the gap which separates the parties is substantial—petitioners having declared a $10 per share value on their gift tax returns and respondent having asserted a $30 per share value in his deficiency notice and amended answer.

The fulcrum of respondent's position is that shares of Sel-Rex were offered to the public in January 1962, 4 months after the gift dates (in September 1961) at a price exceeding $30 per share. He insists that, in accordance with his regulations (sec. 25.2512-2, Gift Tax Regs.), "the public offering price, less a discount for lack of marketability on the valuation dates, *is the best, and indeed the only cogent evidence* of fair market value." (Emphasis added.)

We are not unaware that sales prices at or about the critical date are highly relevant to determining value. But, other things being equal, where such prices are reflected by private sales, only a time differential exits. Where such prices are reflected in sales through public trading and a public market does not exist on the critical tax date, there is a further difference going to the underlying character of the property. In short, a publicly traded stock and a privately traded stock are not, as respondent would have us assume, the same animal distinguished only by the size, frequency, or color of its spots. The essential nature of the beast is different.

In thus disagreeing with respondent's approach, we are not suggesting that the January 1962 price at which Sel-Rex stock was sold to the public should be ignored. On the contrary, we think it is a factor to be taken into account, but with due regard given to the time span involved between the critical dates and the dates of sale to the public, as well as to the contingencies inherent in the successful culmination of a contemplated public offering. In this context, we have also taken into account the fact that a preliminary registration was filed with the Securities and Exchange Commission approximately 2 weeks after the gift dates. The price stated therein was, however, expressly stated to have been made solely for the purpose of calculating the registration fee. We note also that, whatever hopes Sel-Rex, petitioner, and the underwriters may have had and whatever informal discussions may have taken place among them during the latter part of September 1961, the fact remains that the offering price was not fixed until 4 months later, just prior to the public offering in January 1962. It is a matter of common knowledge that, as a result of the vagaries of the stock market and other national and international events, many a contemplated public offering never sees the light of day and that, because of factors affecting the market at the particular moment of the public offering, the offering price can be radically different from the price originally contemplated. In September 1961, there was no probable basis for predicting that a public offering would in fact take place at all and even less for estimating the particular price of the offering. Under these circumstances, the preliminary registration statement and the subsequent developments leading to the public offering four months later are, in our opinion, of marginal significance. The fact that the general market was stable throughout the time span does not require a different conclusion. The cases which respondent finds so comforting do not point in a contrary direction in view of the fact that, in those cases, there were sales to the public prior to the valuation date. See 10 Mertens, Law of Federal Income Taxation, sec. 59.13 (Zimet Rev.).

We similarly view respondent's attempt, by a process of relation back, to utilize the financial position of Sel-Rex as revealed by the December 31, 1961, consolidated balance sheet as a basic prop for his determination of value. Its yearend financial position could not have been known with any degree of certainty in mid-September 1961. Consequently, although we have not ignored the data contained therein, we have accorded it little weight.

Respondent's approach would have greater merit if he had sought merely to utilize the January 1962 public offering price and the financial data as at December 31, 1961 to corroborate an otherwise well-founded September 1961 valuation. But, as we have pointed out, he did not do this. Rather, he and his one expert witness [4] started with these elements and worked back. What might have been a measuring stick was unjustifiably employed as a divining rod.

We turn now to petitioner's approach to the problem of valuation. Essentially, his position rests on the facts that shares of Sel-Rex (a) were sold at approximately $10 per share to Wertheim & Co. and Collart in June of 1961, (b) were exchanged at $6.90 per share for shares of Sel-Rex, S.A., held by Rochat and Rinker, also in June of 1961, and (c) were sold at $10 per share to Burstein and Habas in September of 1961. We have found that all of these transactions were arm's length and, absent other circumstances, they might be determinative of the valuation question before us. But the $10 price was agreed upon with Wertheim & Co. in December of 1960. The business relationship between Sel-Rex and the other purchasers makes it reasonable to infer, and we have so found, that the transactions with them in all probability simply followed the pattern established by the Wertheim transaction and did not involve an independent reevaluation of the agreed sales prices. Yet, by the summer of 1961, additional figures showing the increased growth of Sel-Rex earnings were obviously available. Granted that Wertheim & Co. took prospective earnings into account in determining the $10 price it agreed to in December of 1960, the fact is that the continued success of Sel-Rex in the ensuing months was so marked as to support some increase in the value of the shares at the gift dates. Petitioners' two expert witnesses, whose qualifications were beyond question, submitted highly sophisticated analyses and arrived at valuations of $12.50 and $13.00 per share as of September 1961.

---

[4] The qualifications of respondent's expert witness left much to be desired. He had never previously valued a company comparable to Sel-Rex, his experience was limited to publicly traded stock, he was not familiar with the precious metals electroplating business, he made no personal investigation of Sel-Rex and its operations, as petitioners' expert witness did, nor did he make any comparison with publicly traded shares of other companies engaged in the same type of business in order to be in a position to judge whether or not they were comparable to Sel-Rex and, if they were, to take such comparable analysis into account.

Perhaps if the prior transactions were not subject to the infirmities we have noted, we would be disinclined to allow these detailed valuations, which are so carefully documented from a technical point of view and which are not substantially in excess of the value utilized by petitioners in their gift tax returns, to vary prices which we are satisfied were established in the maelstrom of the market place. Cf. *Fitts' Estate* v. *Commissioner*, 237 F. 2d 729, 731 (C.A. 8, 1956), affirming a Memorandum Opinion of this Court. But, under the circumstances outlined, we view this expert testimony as tending to confirm our judgment that the critical value was in excess of $10 per share and hold that petitioners have not sustained their burden of proof in establishing a value of less than $13 per share for the 2,400 shares of Sel-Rex gifted on September 13, 1961, and the 24,000 shares gifted on September 16, 1961. Accordingly, for the purposes of the Rule 50 computation herein, these shares should be valued at $13 per share.

In addition to the gifts with which we have previously dealt, petitioner, in September of 1961, sold 10,000 shares of Sel-Rex to his son Robert, also at a price of $10 per share. Respondent maintains that the excess of the claimed value of $30 per share over that price constitutes a taxable gift under section 2512(b). Respondent first asserted this position by way of his amended answer under section 6214(a). Consequently, as we have pointed out, the burden of proof is upon him. See fn. 1, *supra*.

As far as the valuation element of this issue is concerned, respondent relies on the same evidence as was submitted in connection with the transfers which were concededly gifts. He seeks to reinforce his position by asserting that (a) Robert was a natural object of petitioner's bounty; (b) petitioner was obviously predisposed to benefiting Robert, as evidenced by direct gifts of Sel-Rex shares to Robert and indirect gifts of such shares to a trust for Robert's benefit in September of 1961; and (c) petitioner knew or should have known that the stock was worth in excess of $10 per share, although he may not have known its exact worth.

We are not impressed with respondent's arguments. While a father in the normal course of events would be expected to want to benefit a son, it does not follow that every transaction with a son must be endowed with a conclusive presumption of suspicion. Indeed, in this case, we are disposed to view the conceded gifts as establishing a pattern of petitioner's desire to benefit each of his children without favoritism and that the separate sale of the 10,000 shares to Robert alone for what petitioner in good faith considered a fair price, rather than being an indication of an intention gratuitously to benefit Robert, confirms petitioner's objective of equal treatment. Under all the cir-

cumstances, we hold that respondent has failed to sustain his burden of proof that, as to the 10,000 shares sold to Robert, any part thereof constituted a gift.

Too often in valuation disputes the parties have convinced themselves of the unalterable correctness of their positions and have consequently failed successfully to conclude settlement negotiations—a process clearly more conducive to the proper disposition of disputes such as this. The result is an overzealous effort, during the course of the ensuing litigation, to infuse a talismanic precision into an issue which should frankly be recognized as inherently imprecise and capable of resolution only by a Solomon-like pronouncement. See *Commissioner* v. *Marshall*, 125 F. 2d 943, 946 (C.A. 2, 1942) ; Bosland, "Tax Valuation by Compromise," 19 Tax L. Rev. 77 (1963).

We have studiously sought to avoid this pitfall. Thus, we have not subjected the detailed after-the-fact analysis of each expert witness to the dissection process of a scientific laboratory nor have we independently constructed each of the various elements which may be appropriate to the determination of fair market value. Cf. *Central Trust Company* v. *United States*, 305 F. 2d 393 (Ct. Cl. 1962). Similarly, we have concluded that extensive citation of previously decided valuation cases would serve no useful purpose—each case necessarily turns on its own particular facts. Instead, we have indicated the particular difficulties with the basic approaches of the parties herein and then sought, in the total context of this case, to analyze the fair market value of the shares on the gift dates as seen through the eyes of an average purchaser—neither as expert as petitioners' witnesses nor as retroactively imbued with the "hot issue" fever as the respondent's witness appeared to be. Our conclusion has been reached on the basis of weighing all the facts and circumstances revealed by the entire record herein and with due regard to the burden of proof placed on each of the parties by law.

## II

In 1961, petitioner made gifts for the benefit of his grandchildren, Robin May and Bonnie Lynn Messing, both of whom were minors. The gifts, consisting of checks and bonds, were in the names of the parents of the children as follows: Robert and Norma Messing, "I/T/F" (in trust for) (name of grandchild). No formal trusts were ever created. The checks were deposited in bank accounts bearing the same designations. The question before us is whether these transfers, which both parties recognize as gifts, were present interests and there-

fore entitled to the $3,000 annual exclusion provided for in section 2503.[5]

Petitioner testified that he intended that his grandchildren have the immediate benefit of the gifts; that the funds be used for their support and maintenance and exclusively for their benefit; and that the transfers were made by him acting entirely on his own and as a layman, based upon his limited experience with bank accounts. We find his testimony wholly credible.

At the outset, it is clear that the use of the word "trust" is not determinative for tax purposes; we will not permit ourselves to be tyrannized by labels. E.g., *Laura M. Hutchinson*, 47 T.C. 680 (1967); *Prudence Miller Trust*, 7 T.C. 1245 (1946). Under the decisions in the jurisdictions potentially involved—New Jersey and New York—there is ample authority for holding that the mere specification that property is to be held "in trust for" without more—the situation herein—vested the entire legal and equitable estate in the beneficiary grandchildren and that no ownership interest passed to their parents. *Supreme Lodge, K.P.* v. *Rutzler*, 87 N.J. Eq. 342, 100 A. 189 (1917); *Jacoby* v. *Jacoby*, 188 N.Y. 124, 80 N.E. 676 (1907); *Matter of De Rycke's Will*, 99 App. Div. 596, 91 N.Y.Supp. 159 (2d Dept. 1904); *Matter of Baker's Will*, 31 Misc. 2d 426, 231 N.Y.S. 2d 470 (Westchester Co. Surr. Ct. 1962); *Matter of Kuehnle's Will*, 4 Misc. 2d 548, 158 N.Y. S. 2d 692 (Queens Co. Surr. Ct. 1956). In the event of death before the cash or bonds were actually turned over by the parents, the ownership would pass to the estate of the deceased grandchild. *Supreme Lodge, K. P.* v.

---

[5] SEC. 2503. TAXABLE GIFTS.

(a) GENERAL DEFINITION.—The term "taxable gifts" means the total amount of gifts made during the calendar year, less the deductions provided in subchapter C (sec. 2521 and following).

(b) EXCLUSIONS FROM GIFTS.—In the case of gifts (other than gifts of future interests in property) made to any person by the donor during the calendar year 1955 and subsequent calendar years, the first $3,000 of such gifts to such person shall not, for purposes of subsection (a), be included in the total amount of gifts made during such year. Where there has been a transfer to any person of a present interest in property, the possibility that such interest may be diminished by the exercise of a power shall be disregarded in applying this subsection, if no part of such interest will at any time pass to any other person.

(c) TRANSFER FOR THE BENEFIT OF MINOR.—No part of a gift to an individual who has not attained the age of 21 years on the date of such transfer shall be considered a gift of a future interest in property for purposes of subsection (b) if the property and the income therefrom—

(1) may be expended by, or for the benefit of, the donee before his attaining the age of 21 years, and

(2) will to the extent not so expended—

(A) pass to the donee on his attaining the age of 21 years, and

(B) in the event the donee dies before attaining the age of 21 years, be payable to the estate of the donee or as he may appoint under a general power of appointment as defined in section 2514(c).

*Rutzler, supra; Matter of Wolf's Will,* 140 Misc. 595, 251 N.Y. Supp. 552 (Kings Co. Surr. Ct. 1931) ; cf. *In re Schaefer's Estate,* 121 N.Y. S. 2d 233 (N.Y. Co. Surr. Ct. 1953).

Thus, it appears to us that the gifted property was in substance not held in trust but rather was held by the parents as guardians, in which event the transfers clearly constitute present interests under section 2503(b). *Ross* v. *United States,* 348 F. 2d 577 (C.A. 5, 1965) ; *United States* v. *Baker,* 236 F. 2d 317 (C.A. 4, 1956) ; *Beatrice B. Briggs,* 34 T.C. 1132 (1960) ; Rev. Rul. 59–78, 1959–1 C.B. 690. Alternatively, if the arrangement is considered a trust, the requirements of section 2503(c) would be met because the property and the income therefrom was to be expended for the benefit of the grandchild and, to the extent not so expended, would pass to the grandchild upon his attaining the age of 21 or to his or her estate in the event of death prior thereto. We need not decide between these two alternatives since, in either case, the $3,000 annual exclusion applies.

## III

The final issue involves the question whether transfers in 1958 and 1959 under the December 26, 1958, trust agreement constituted gifts of present or future interests under section 2503, i.e., whether they were entitled to the benefit of the $3,000 annual exclusion.[6]

Under the trust agreement, income was to be applied, in the discretion of the trustees, for the benefit of the beneficiary and, to the extent not so applied, accumulated during minority. The trustees were also given discretion to pay out principal during minority. The trust was to terminate upon the beneficiary's attaining the age of 21, with the principal and accumulated income to be paid to the beneficiary or upon the beneficiary's death prior to 21, in which event the principal and accumulated income were to be paid to his or her surviving issue or, if there were no surviving issue, to the beneficiary's estate.

If the trust instrument is taken at face, the gifts unquestionably do not qualify for the $3,000 annual exclusion. The pattern is the classic illustration of a future interest unless the safe harbor of section 2503 (c) comes into play. *Arlean I. Herr,* 35 T.C. 732, 734–735 (1961), affd. 303 F. 2d 780 (C.A. 3, 1962) ; *Jacob Konner,* 35 T.C. 727, 730–731 (1961). In the event of death, the gifts were to the beneficiary's issue and only *contingently* to his or her estate. Thus, the application of section 2503(c) is precluded. Cf. *Bernie C. Clinard,* 40 T.C. 878 (1963) ; *Bonnie M. Heath,* 34 T.C. 587 (1960).

---

[6] The issue of the exclusion of gifts in 1958 and 1959 is material to the computation of gift tax liability in 1961. Sec. 2502.

Petitioner seeks to avoid these consequences by arguing that the express language of the trust instrument is an inaccurate reflection of his true intent, resulting from a scrivener's error by his counsel, upon whom he relied completely. The only evidence he presented was his testimony "that it was my intention that there be a gift which would be deemed a gift of a present interest, both of income and of corpus. I certainly did not intend to create a gift of a future interest."

We are not disposed, on the basis of such generalities, to rewrite the clear language of a trust instrument, which was obviously carefully drafted by competent counsel. The transfers in cases relied upon by petitioner involved ambiguities which afforded latitude for reasonable construction and are thus clearly distinguishable.

We hold that the transfers in 1958 and 1959 under the December 26, 1958, agreement were gifts of future interests.

*Decisions will be entered under Rule 50.*