ESTATE OF CARL L. HARMS, DECEASED, IRMA MAE FREED, EXECUTRIX, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Harms v. Commissioner
Docket No. 11055-79.
United States Tax Court
T.C. Memo 1981-320; 1981 Tax Ct. Memo LEXIS 421; 42 T.C.M. (CCH) 206; T.C.M. (RIA) 81320; June 23, 1981. James Donovan, for the petitioner. Jack E. Prestrud, for the respondent. EKMAN
MEMORANDUM FINDINGS OF FACT AND OPINION EKMAN, Judge: Respondent determined a deficiency of $ 43,781.36 in petitioner's Federal estate tax. The sole issue for our decision is the value of decedent's 120-acre farm. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Irma Mae Freed (hereinafter petitioner) is the duly qualified executrix of the estate of Carl L. Harms, deceased. The residence of petitioner at the time the petition herein was filed was Toledo, Ohio. Carl L. Harms (hereinafter decedent) died on August 28, 1976. At the time of his death, decedent owned, inter alia, *422 120 acres of real property (hereinafter the Harms property) located in Monroe Township, Henry County, Ohio. The specific location of the Harms property is 4 miles south and 3 miles east of the city of Napoleon, Ohio. The general area is rural, consisting mostly of farmland and scattered residential units. Agriculture is the major industry in the area. The Harms property is rectangular in shape and nearly level. It is tiled every 50 feet and there has been no major new retailing for some 15 years. [1] The soils on the property are predominantly loams, specifically Mermill loam, Mermill clay loam and Millgrove loam; however there are areas of Guilford fine sandy loam and Hoytville clay. The immediate area is regarded as a good farm area although not quite as good as some other nearby areas, particularly south, southwest, and southeast of the property. The property is severed by a meandering open ditch entering the property about the middle of its southern boundary and traversing north-north-easterly. [2] The property is zoned for agricultural use with residential use permitted. *423 Two groups of structures, both some 50 to 60 years old, are located upon the property. The south group of structures consists of a house, a garage, three sheds, a poultry shed, and a barn. The north group of structures consists of a house and a garage. The two residences were rented, one at $ 65 per month and the other at $ 60 per month. The water supplied to the two houses, and to the whole area, known as "black sulfur water", is most unappealing to those not accustomed to its odor and taste. Willis H. Bash, who appraised the property on behalf of respondent, determined that the highest and best use of the two houses was for residential purposes and the highest and best use of the remainder of the Harms property was for farmland. He employed in his appraisal the comparable sales method. Norman J. Meyer, who appraised the property on behalf of petitioner, utilized the income method for the two houses and the comparable sales method for the remainder. Mr. Meyer, who was employed by the Henry County Bank beginning in July 1956, was a vice president for 15 years, during the last 10 of which he was in charge of all commercial real estate appraisals. His appraisals were directed *424 to the loan committee so that it could calculate loans o both real and personal property. From 1960 to 1977 Meyer was in charge of the bank's branch which served the area encompassing the Harms property. On occasion Meyer has been hired by attorneys to serve as an appraiser for estate tax purposes before various levels of the Internal Revenue Service and has been appointed an appraiser by the Probate Division of the Court of Common Pleas of Henry County, Ohio. However, he had never testified as an expert witness in any court on the subject of real estate valuation. Meyer was a close friend of decedent and was related to decedent by marriage. He owns and operates a farm in the vicinity of the Harms property. Mr. Bash has been a real estate appraiser for approximately 40 years. In addition to being a member of numerous professional appraisal organizations, he is a member of the American Institute of Real Estate Appraisers (M.A.I.) and has testified as an expert in more than 200 court proceedings representing both industrial and governmental units. His report was prepared prior to respondent's mailing of the notice of deficiency. In the Federal estate tax return, petitioner *425 reported the value of the property to be $ 900 per acre, an aggregate value of $ 108,000. In his report, Meyer appraised the south residence at a date of death value of $ 8,000, the north residence at $ 7,000, 116 acres of the farmland at $ 1,300 per acre ($ 150,800), and thus the total Harms property at a value of $ 165,800. [3] At trial Meyer testified that the value of the Harms property, including the structures thereon, was $ 1,300 per acre and on brief petitioner utilizes that $ 1,300 per acre value for the entire 120 acres arriving at a total value for the property of $ 156,000. In his statutory notice of deficiency, respondent determined that the date of death value of the Harms property was $ 2,196 an acre, an aggregate value of $ 263,500. Bash appraised the south residence and related structures at a date of death value of $ 18,000, the north house and related garage at a value of $ 15,500, the remainder, 118 acres, at a value of $ 230,000, [4] and the total Harms property at a value of $ 263,500. [5] The Henry County 1976 real estate records list the total value of the Harms property as $ 268,320. [6]
*426 ULTIMATE FINDING OF FACT As of August 28, 1976, the date of decedent's death, the value of the Harms property was $ 222,300. OPINION The parties agree that the sole issue in this case is the fair market value of the Harms property on August 28, 1976, the date of death. Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Section 20.2031-1(b), Estate Tax Regs. Petitioner has the burden of proving that respondent's determination of the fair market value of the property is incorrect. Welch v. Helvering, 290 U.S. 111 (1933), Rule 142(a), Tax Court Rules of Practice and Procedure.
Both Meyer and Bash agree that the highest and best use for most of the Harms property was farmland and appraised this part of the property by use of the comparable sales method. Bash appraised the structures by use of the comparable sales method and Meyer appraised them by use of the income method. [7]
*427 1. Bash appraisal. Bash used the following comparables for the farmland: Number
B**1
B**2
B**3
B**4
B**5
Size (acres)
39.0
40.0
60.0
76.3
80.0
Date of Sale
3/31/76
1/24/75
8/27/76
11/1/75
1/2/76
Price (per
acre)
$ 1,800
$ 1,612
$ 1,724
$ 1,650
$ 1,810
Bash made positive or negative adjustments to the comparable properties in consideration of location, time of sale, and land (size, soil content, drainage, and known detriments) as follows: 1. He considered the location and land of B**1 to be sufficiently similar to that of the Harms property so as to require no adjustments in those areas; however he made a positive adjustment to reflect time of sale. 2. Bash considered the land of B**2 to be superior to that of the Harms property and therefore a negative land adjustment was made. Although B**2 was located about 4 miles east and 2 miles north of the Harms property, he considered the areas to be sufficiently similar so as to not warrant any adjustment for location. A positive adjustment was made to reflect time of sale. 3. Although B**3 was 6 miles south-southwest of the Harms property, Bash still regarded the areas to *428 be equivalent and made no adjustment for location. Inasmuch as the sale of B**3 occurred 1 day before the date of decedent's death, no adjustment was made for time of sale. A positive adjustment was made to reflect Bash's opinion that the land of B**3 was inferior to the Harms land. 4. The variables and adjustments were not developed by Bash for B**4 because of lack of adequate confirmation but he considered the sales price indicative of the value he arrived at for the Harms property. 5. For B**5, Bash made a negative adjustment in location because he considered it to be located in a better general farm area than the Harms property. He made no adjustment to reflect a land differential and made a positive adjustment to reflect time of sale. Bash used the following comparables for the two sets of structures: [8]
Number
W**1
W**2
W**3
W**4
W**5
Size (acres)
0.878
1,287
1.0
1.0
3.0
Date of Sale
3/11/75
3/20/76
8/6/76
6/25/76
4/23/76
Price
$ 14,500
$ 16,000
$ 18,000
$ 18,300
$ 19,900
*429 He made adjustments in consideration of quality and age of the structures, location, land, land improvements, and time of sale. Again, a positive adjustment was made for those areas in which he regarded the structures on the Harms property to be better than the comparable; a negative adjustment for those areas in which he regarded the comparable to be better than the Harms structures. First, comparisons of W**1-W**5 were made with the south structures and then the south structures were compared with the north structures. Bash considered the quality and age of the south structures to be better then W**1 and therefore made a positive adjustment in structures. He also made a positive adjustment to reflect time of sale. For both W**2 and W**5, he made positive adjustments to reflect time of sale, negative adjustments in land, and positive adjustments in quality of structures; and for W**4 he made a positive adjustment to reflect time of sale and a negative adjustment in quality of structures. No adjustments were made for W**3. Rather than compare sales and make adjustments as he did for the south structures, Bash considered the value of the north structures to be 12-15% (or *430 $ 2,500) less than the value of the south structures and determine the value of the north structures accordingly. 2. Meyer's appraisal. Meyer used comparable sales to arrive at the value of the farmland although such comparables were not included in his prepared report. At trial he testified that he used the following comparables in determining that the value of this farmland was $ 1,300 per acre: Acre Sale
Date
Price per acre
M**1
February 1975
$ 837
M**2 [9]
February 1976
775
M**3
May 1977
1,500
M**4
1,036
M**5
April 1976
1,306
M**6
December 1978
1,400
Meyer adjusted sales prices to reflect the size, date of sale, location, soil content, and drainage. For M**1, Meyer testified that the tiling and soil were better on the Harms property and accordingly made adjustments to reflect this as well as an adjustment to reflect time of sale. Meyer considered the soil of M**2 better than the soil on the Harms property but he was aware of a drainage problem *431 on M**2. Meyer testified that he made adjustments in M**3 and M**5 to reflet soil quality and time of sale and that M**6, a sale from a father to his two sons, was for property adjacent to the Harms property. Although his appraisal of the north and south houses was not fully explained in his report, Meyer testified that he based it upon a 1 to 1 1/2 percent return per month, thus yielding $ 7,000 to reflect a monthly rental income of $ 60 and $ 8,000 for a monthly rental income of $ 65. 3. Valuation of the Harms property. At the outset we note that the income method used by Mayer to value the structures is inappropriate and will be given little weight. There were few renters in that area, the structures were not "investment type" property, [10] and no evidence was presented to indicate what, if any, correlation rental income had to value of structures in that area. The comparable sales approach, as used by Bash in his report, was a more appropriate method for valuing the two groups of structures. Meyer had the advantage of being quite knowledgeable *432 about and familiar with the specific area encompassing the Harms property; in fact he was familiar with the Harms property itself. He owns and operates a farm in the vicinity. He had substantial experience in appraising property in that area for bank loan purposes. His experience in valuation has been for the most part directed toward ensuring the safety of the loan; thus he was concerned more with whether a debtor could generate income and with the amount the bank could receive in the event of a forced sale, see section 20.2031-1(b), Estate Tax Regs., than with the price agreed to by a "willing buyer and willing seller, neither being under any compulsion to buy or to sell". However, in view of Meyer's expertise in valuation and familiarity with the specific area and the Harms property itself, we find his appraisal of the property entitled to probative weight in our determination of its fair market value. Bash has been a expert appraiser for many years and, although perhaps not as familiar as Meyer with the exact area in which the Harms property is located, he has sufficient familiarity with farmland in that area to qualify him to render an expert opinion as to its value. His *433 report was extensive, thorough and considered many variables including size, location, soil content, and drainage. While the Meyer report did not include comparables, Meyer testified to the comparables he used in making his determination. However, we find he did not consider and compare many of the variables taken into account in the Bash report. His testimony did not reflect sufficient consideration of the effect of each variable on each property and he did not ascribe sufficient weight to the circumstances surrounding some of the sales e.g., that M**6 was the sale from a father to his two sons, or that M**2 was the sale from a decedent's estate to a beneficiary. Nonetheless, while the Bash report considered many factors and variables in its comparisons of each property with the Harms property, Meyer's comparables were for sales of property in closer geographical proximity to the Harms property than those used by Bash. Petitioner contends that the meandering ditch was a detriment to the property not adequately accounted for in Bash's appraisal, but we note that the report lists the ditch as a "major detriment" and Bash made a substantial adjustment in each comparable to *434 reflect its effect on value. Petitioner further contends that the Bash appraisal does not adequately consider the effect of the tiling on fair market value. Under modern standards, a farm should be tiled every 33-35 feet and the Harms farm is titled only every 50 feet. Although the Bash report considers the poor tiling and this factor is weighed in comparing the sales, we find that the tiling of the farm has a greater effect on fair market value than reflected in the Bash appraisal. Because of the poor tiling and the condition of the creek into which the tiles would drain, extensive damage could result from a heavy rainfall, [11] a possibility a willing buyer and seller would consider more important than reflected in the Bash report. Petitioner contends that it would cost $ 400 per acre to retile. Respondent contends that the effect of the tiling on fair market value has been adequately reflected in the Bash appraisal *435 and that, in any event, the cost of retiling at the time of decedent's death was $ 250 per acre. We agree with petitioner that there should be an adjustment in the Bash appraisal to reflect more accurately the effect on value of the inadequate tiling and drainage. Valuation is a subjective process, incapable of mathematical precision, which requires the exercise of our best judgment under all the circumstances. Messing v. Commissioner, 48 T.C. 502, 512 (1967). Based upon the entire record, including the expert opinions of Bash and Meyer, both of them knowledgeable in valuation and familiar with the specific area, it is our opinion that the value of the Harms property on August 28, 1976, the date of decedent's death, was $ 222,300. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. A good tiled farm, in terms of modern standards, is tiled every 33 to 35 feet and inadequate tiling can cause drainage problems. ↩
2. Meandering ditches are objectionable because they create or leave irregular field areas, a nuisance to the farm operator.↩
3. According to Meyer's report, there is lost acreage due to the creek and an open ditch, thus accounting for his use of less than 120 acres. ↩
4. Bash concludes in his report that the 118 acres had a value of $ 1,950 per acre, an aggregate value of $ 230,100 but rounded it off to $ 230,000. ↩
5. Bash allocated one acre to the south residence and related structures and one acre to the north residence and related structures. ↩
6. The Henry County valuation for real estate tax purposes is broken down as follows: market value of $ 237,780 for the land exclusive of improvements; true value of $ 20,460 for the south residence and related structures; true value of $ 10,080 for the north residence and related structures.↩
7. We note that it is customary for the land and the structures thereon to be sold at a single per acre price but in determining what that per acre price would be, it is often the practice to value the structures and the farmland separately.↩
8. Although he considered seven sales of rural homes, only five were determined to be comparables and although he considered eleven sales of farmland, only five were determined to be comparables.↩
9. Meyer testified that M**2 involved the sale from a mother's estate to her son at the "appraised price" at the time of her death, and admits that some may question this sales price.↩
10. See The American Institute of Real Estate Appraisers, The Appraisal of Real Estate↩, 315-323 (7th Ed. 1978).
11. In recent years there has been only steady rainfall; there has not been any heavy rainfall so as to cause extensive damage to the property. We note that Meyer's knowledge of the area led him to place greater emphasis on these negative factors than did Bash.↩