ESTATE OF SHIRLEY A. BRUCE, DECEASED, PATRICK M. BRUCE, PERSONAL REPRESENTATIVE, Petitioner, v. COMMISSIONER OF INTERNAL REVENUE, Respondent. SHIRLEY A. BRUCE, DECEASED, DONOR AND ESTATE OF SHIRLEY A. BRUCE, DECEASED, PATRICK M. BRUCE, EXECUTOR AND PERSONAL REPRESENTATIVE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Estate of Bruce v. Commissioner
Docket Nos. 27311-90, 27729-90
United States Tax Court
T.C. Memo 1993-244; 1993 Tax Ct. Memo LEXIS 245; 65 T.C.M. (CCH) 2848; June 1, 1993, Filed Decision will be entered under Rule 155. *245 For petitioner: Leo S. Meysing. For respondent: Christine V. Olsen. CLAPP
CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined a deficiency of $ 65,015 in decedent's Federal gift tax for 1982, and a deficiency in petitioner's Federal estate tax of $ 240,271. After concessions by the parties, including resolution of the estate tax deficiency, the issue for decision is whether, as a result of a sale and redemption of the stock of a closely held corporation on or about July 1, 1982, Shirley A. Bruce made a taxable gift to her son and daughter-in-law, Patrick M. Bruce and H. Valerie Bruce, and if so, in what amount. We hold that no such taxable gift was made. All section references are to the Internal Revenue Code in effect for the relevant period. All Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT We incorporate by reference the stipulation of facts and attached exhibits. Petitioner is the Estate of Shirley A. Bruce (decedent). Decedent was a resident of La Grande, Oregon, when she died on January 15, 1987. Decedent's son, Patrick M. Bruce, is the executor and personal representative of petitioner, and *246 he resided in La Grande, Oregon, at the time the petition was filed. Background
Decedent and her first husband, George W. Bruce, purchased a Pepsi Cola soft drink bottling business in 1957. That business was incorporated in October 1965, as the Pepsi Cola Bottling Company of Eastern Oregon (PCBCEO). PCBCEO was authorized to issue up to 1,000 shares of no par value common stock. Prior to August 1, 1973, decedent and her first husband each owned 52 shares of PCBCEO. There were only 104 shares of PCBCEO stock issued at all relevant times. On August 1, 1973, in conjunction with the dissolution of the marriage between decedent and George W. Bruce, PCBCEO entered into a redemption agreement with George W. Bruce. Under the terms of the agreement, PCBCEO agreed to redeem all 52 shares of stock owned by George W. Bruce for $ 250,000. The agreement required PCBCEO to make payment in monthly installments of $ 1,950 principal and interest at 7 percent until the full $ 250,000 was paid. To secure payment of the redemption price, the 52 shares of PCBCEO stock were put into escrow with the Western Bank, Coos Bay, Oregon. On June 30, 1982, the total unpaid principal amount owed by *247 PCBCEO on the George W. Bruce redemption contract was $ 160,446. The July 1, 1982 Sale and Redemption Transaction
In 1982, decedent decided to withdraw from the soft drink bottling business. To effectuate that decision, on July 1, 1982, decedent entered into a stock sale agreement with her son and daughter-in-law, Patrick M. Bruce and H. Valerie Bruce (hereinafter referred to as Patrick and Valerie Bruce), for the sale of 2 PCBCEO shares for a stated contract price of $ 26,451.85. The contract required 15 equal annual installments of $ 3,430 principal and interest at 9.75 percent per annum. Although the stock sale agreement was binding, decedent did not escrow the 2 PCBCEO shares. On the same date, and as part of the same plan, decedent also entered into an agreement with PCBCEO for the redemption of her remaining 50 shares of PCBCEO stock for a stated redemption price of $ 661,296.15. This agreement was amended on July 5, 1982, however, by execution of a "Supplement to Stock Redemption Agreement", which adjusted the redemption price to $ 700,427. Under the supplemented agreement, PCBCEO assigned to decedent a $ 55,748 account receivable due PCBCEO from decedent, with *248 the balance of $ 644,679 payable by PCBCEO to decedent in equal monthly installments of $ 6,830 principal and interest at 9.75 percent per annum. The redemption agreement also prohibited the payment of any dividends and restricted officers' salaries to $ 36,000, or a sum not to exceed 3 percent of gross sales, until the installment debt was fully satisfied. As security for the unpaid balance of the redemption price, the 50 PCBCEO shares redeemed in the transaction were held in escrow at Pioneer Federal Savings and Loan Association of Baker, Oregon. In addition, PCBCEO executed a real property mortgage on PCBCEO's real estate in favor of decedent. PCBCEO also executed security agreements and financing statements on all of PCBCEO's personal property for the benefit of decedent under Oregon's version of Article 9 of the Uniform Commercial Code (UCC). Other Facts Relating to PCBCEO on July 1, 1982
The soft drink bottling industry operates under a territorial franchise system. The franchisor sells syrup and flavoring concentrates to franchisee/bottlers, who bottle and distribute the finished product within the franchisee's geographic territory, usually defined in rural areas *249 by county lines. In general, during the time at issue, the soft drink bottling industry was experiencing both rising sales and rising costs. Overall, the nationwide outlook for the bottling industry was good. PCBCEO held an exclusive bottling agreement issued July 16, 1968, by Pepsico, Inc., under which PCBCEO had exclusive rights to market Pepsi Cola products within the geographical territory composed of the Oregon counties of Malheur, Wallowa, Union and Baker, the town of Meacham, and all outlets adjoining U.S. Highway 30 from its intersection with the southeasterly boundary of Umatilla County to the town of Meacham. PCBCEO also held the 7-Up, Squirt, Mountain Dew, Sunkist, and Hires Root Beer franchises in Union, Malheur, Wallowa, and Baker counties, Oregon. PCBCEO continued to hold those rights on July 1, 1982. PCBCEO's franchise territory encompassed a geographical area of approximately 17,000 square miles in rural eastern Oregon containing a population of approximately 74,000. In general, the economy in PCBCEO's franchise territory was weak. The economy of eastern Oregon was heavily dependent on the region's natural resources, with timber and agricultural products being *250 the area's main products. Both of these industries were in decline in eastern Oregon during 1982, affected by the national recession of that period and the even sharper, long-term deterioration of the area's economy. Prospects for future growth in eastern Oregon were, at best, mixed. In addition, according to 1980 census figures, population growth in the counties within PCBCEO's franchise territory averaged below 2 percent, significantly below the State average. Construction was also sluggish in the counties comprising the franchise territory with only 51 to 245 new construction permits per county filed in 1981. Therefore, while the soft drink industry was generally recession resistent, the franchise area's demographics did not indicate continued or substantial increases in future sales. Until June 1981, PCBCEO operated as a bottling and distribution company; PCBCEO purchased soft drink syrups, purified water, ran a single-line bottling plant (combining the syrup and purified water), and sold the finished product it produced. The bottling equipment had become old and inefficient, causing high breakage losses in 1980 and 1981, prompting PCBCEO to obtain its soft drinks from *251 outside sources. In January 1980, PCBCEO and other small soft drink companies formed Mount Angel Beverage Co., Inc. (Mount Angel), a canning operation located approximately 300 miles from La Grande in Mount Angel, Oregon, near Portland, Oregon. PCBCEO purchased 1 share of Mount Angel stock for $ 5,000 and guaranteed $ 450,000 of Mount Angel's corporate bond indebtedness. In December 1980, PCBCEO and other small soft drink companies also formed Nez Perce Bottling Company, Inc. (Nez Perce), in Lewiston, Idaho, which is approximately 200 miles from La Grande. PCBCEO purchased 250 shares of Nez Perce common stock (which represented 32.33 percent of the equity of Nez Perce) for $ 25,000 and guaranteed $ 417,000 of Nez Perce's debt. After June 1981, PCBCEO ceased bottling its own soft drinks and purchased its products from Mount Angel, Nez Perce, and John Noel Company, which is located in Yakima, Washington. Thus, on the July 1, 1982, valuation date, PCBCEO was a small, soft drink distributing company. PCBCEO's facilities included a 24,000 square-foot warehouse, an office building, and adjacent yard for soft drink inventory. The warehouse housed the obsolete bottling equipment. *252 PCBCEO employed between 16 to 18 nonunion personnel, including 7 route drivers. During the several years preceding the sale and redemption transaction, PCBCEO experienced increasing gross sales, from $ 1,243,000 in 1977 to $ 1,926,000 in 1981, but decreasing net profits from $ 105,000 in 1978 to $ 24,000 in 1981. PCBCEO was valued as of September 30, 1981, at $ 500,000 for purposes unrelated to the present litigation. It had a book stockholder's equity on June 30, 1982, of $ 437,354, which included a writeup of fixed assets per an appraisal of $ 87,059. The note that PCBCEO issued to decedent on July 1, 1982, in consideration for the redemption of her 50 shares of PCBCEO stock eliminated all $ 437,354 of PCBCEO's stockholder's equity as of June 30, 1982, and was primarily responsible for creating the $ 236,852 negative stockholder's equity as of September 30, 1982. The negative net worth and the $ 6,830 monthly repayment obligation for 15 years had a significant detrimental fiscal effect on PCBCEO on July 1, 1982. Consequently, in addition to adding substantially to PCBCEO's going-concern risk, PCBCEO's ability to expand, take advantage of business opportunities, and pay dividends *253 was virtually eliminated. The value of PCBCEO on July 1, 1982, after completion of the sale and redemption transaction, was substantially less than $ 26,451.85. OPINION The gift tax is imposed "on the transfer of property by gift". Sec. 2501(a)(1). In valuing property for gift tax purposes "All relevant facts and elements of value as of the time of the gift shall be considered." Sec. 25.2512-1, Gift Tax Regs. Specifically, in determining the net value of transfers of interests in businesses, the relevant factors to be considered include: "A fair appraisal as of the date of the gift of all the assets of the business", sec. 25.2512-3(a)(1), Gift Tax Regs.; "the demonstrated earning capacity of the business", sec. 25.2512-3(a)(2), Gift Tax Regs.; and "the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors", sec. 25.2512-2(f)(2), Gift Tax Regs. Respondent determined that decedent made a taxable gift of $ 439,252 to Patrick and Valerie Bruce as a result of the stock sale and redemption transaction that occurred on July 1, 1982. Respondent computes the taxable gift as follows: Respondent's expert's opinion
of Fair Market Value of PCBCEO on
July 1, 1982, on a preredemption basis:
$ 800,000 Fair Market Value - Notes [1]
on July 1, 1982:
(305,000)
$ 495,000 Other Consideration - PCBCEO
account receivable assigned
to decedent:
(55,748)
Taxable Gift
$ 439,252 *254 Petitioner takes the position that the stock sale and redemption transaction was an arm's-length transaction in which decedent received at least as much as she gave up with the result that there was no gift element to the transaction. Petitioner arrived at this zero gift result by offsetting the agreed discounted combined value of $ 305,000 for the note given by Patrick and Valerie Bruce and the PCBCEO redemption note with his appraiser's opinion that PCBCEO was worth $ 305,600 on June 30, 1982. Since these two numbers essentially offset each other, petitioner concludes that there was no gift. The Court has attempted to make sense out of both parties' approaches, but without success. *255 It appears that both sides are using appraisals, which either make incorrect assumptions or describe considerations without demonstrating how those considerations entered into the appraiser's final conclusion. Both sides have mixed and matched before and after numbers, which may mix but do not match. The arguments of both sides are so full of apple and orange comparisons that the Court is forced to chart its own course through the maze which passes for a record in this case. Actually the problem is not as complicated as the parties have made it. The details of the transaction are clear and undisputed: decedent sold 2 shares of PCBCEO stock to Patrick and Valerie Bruce for their note in the amount of $ 26,451.85, and PCBCEO redeemed decedent's remaining 50 shares of stock for a PCBCEO note in the amount of $ 644,679, plus the assignment to decedent of an account receivable from her in the amount of $ 55,748. Respondent has determined that as a result of this transaction decedent gave away more to her son and daughter-in-law than she received, with the excess being a gift. Petitioner disagrees and contends that decedent gave away no more than she received in the transaction. *256 We agree with petitioner and, in fact, conclude that decedent probably received more than she gave away. The first step in the analysis is to look at what decedent transferred to Patrick and Valerie Bruce. She transferred 2 shares of stock, which, upon completion of the entire transaction, constituted all of the stock of PCBCEO. Respondent's expert valued the company at $ 800,000 and petitioner's expert valued the company at $ 305,600. For reasons that will be discussed below we disregard both conclusions. The record indicates that the company was valued at $ 500,000 on September 30, 1981, 9 months before the July 1, 1982, transaction and alleged gift. This earlier appraisal was done in connection with decedent's divorce and was entirely unrelated to the transaction before us. That $ 500,000 figure is probably the best estimate of what the company was worth before the July 1, 1982 transaction, and we adopt it as a starting point. What Patrick and Valerie Bruce received on July 1, 1982, was essentially this same company worth $ 500,000, but now burdened with $ 644,679 worth of debt and relieved of a receivable which was carried on the books as an asset in the amount of $ 55,748. *257 In addition, the company was further burdened with mortgages, UCC financing statements, dividend and compensation restrictions, and other restrictions until such time as the installment debt was satisfied. As a result, the alleged donees received a $ 500,000 company devalued by approximately $ 700,000 in book value terms. It is acknowledged that the parties have agreed that the notes have a deeply discounted fair market value; however, the company is liable for repaying the full face amount of the redemption note plus interest, and the fact that the holder of the note could not negotiate it at the full face value is of little comfort to the company. Furthermore, it has the continuing obligation to make payments of principal and interest, which seriously affect its cash flow. We also note that the book value of the stockholder's equity on June 30, 1982, was $ 437,354, which included a writeup of fixed assets per an appraisal in the amount of $ 87,059. A comparable balance sheet as of September 30, 1982, showed a negative stockholder's equity of $ 236,852, reflecting the July 1, 1982, redemption. Accordingly, we conclude that on July 1, 1982, Patrick and Valerie Bruce became *258 the 100-percent stockholders of a company that had a substantial negative stockholder's equity and was essentially insolvent. The other side of the equation is what Patrick and Valerie Bruce gave up to acquire the company; they gave decedent their note in the face amount of $ 26,451.85 plus interest. Therefore, we conclude that decedent received from Patrick and Valerie Bruce substantially more then she transferred to them, and there was no gift by decedent resulting from the July 1, 1982, stock sale and redemption transaction. We comment in passing that both parties have assumed in their arguments and computations that the two notes, i.e., the $ 26,451.85 note from Patrick and Valerie Bruce and the $ 644,679 redemption note from PCBCEO, had a combined discounted fair market value on July 1, 1982, of $ 305,000. The problem is that this discounted value is essentially irrelevant. Although decedent received the PCBCEO redemption note as part of the July 1, 1982, transaction, it was received as part of the redemption of her 50 shares of stock and was not consideration in any way running from Patrick and Valerie Bruce, the alleged donees, to decedent. The PCBCEO redemption note has *259 a bearing on the issue before us only to the extent that it affects the value of PCBCEO stock, which was transferred by decedent to Patrick and Valerie Bruce. The important value here is the face amount for which the company is liable and not the discounted value for which the note might be negotiated to a third party. Moreover, Patrick and Valerie Bruce's note in the amount of $ 26,451.85, may have a discounted fair market value, but that is essentially immaterial here since we have found that the value of the company is substantially less than $ 26,451.85, so there would be no taxable gift regardless of the discounted value of the Patrick and Valerie Bruce note. Respondent's expert, David W. Simpson (Simpson), conducted his appraisal in 1991 and found that the value of PCBCEO as of July 1, 1982, was $ 800,000. A major problem with Simpson's report is that the valuation was done on a pre-redemption basis. Consequently, he completely omitted from consideration the very transaction which respondent claims generated a taxable gift. We are concerned with the value of the company that was transferred to Patrick and Valerie Bruce; it was a company that had just redeemed 50 shares *260 and created a large redemption note obligation. Simpson testified that he valued the company preredemption because those were his instructions. Whatever the reason, his approach makes his conclusion totally useless to the Court. We further note that his valuation approaches all involve the capitalization of earnings or cash flow, and he used earnings and cash flow prior to the redemption. The redemption note and the restrictions that went with the redemption transaction would have a substantial negative impact on earnings and cash flow, which Simpson, likewise, did not take into account. Petitioner's expert, James M. Hansen (Hansen), valued PCBCEO as of two different dates for two different purposes. One valuation was performed in 1991 for the instant case and valued PCBCEO as of June 30, 1982, at $ 305,600. The other, which was performed during 1981 valued PCBCEO as of September 30, 1981, at $ 500,000 and was done for purposes of decedent's divorce proceedings from her second husband. Hansen's valuation analysis included an evaluation of the soft drink industry generally, the local economy and its trends; the history, nature, and financial status of PCBCEO; and the overall *261 outlook for PCBCEO. Hansen employed two basic valuation approaches: The capitalization of proprietary income approach, and the market value approach. Hansen stated that he gave consideration to the redemption. However, it is not clear how the July 1, 1982, transaction was translated into numbers that eventually evolved into his appraisal of $ 305,600 as the value of PCBCEO. The Court notes that it may be more than coincidental that this value is almost identical to the agreed-upon combined discounted market value of the two notes, i.e., $ 305,000, to which both parties have ascribed such great importance. We have concluded that the combined discounted value of both notes is irrelevant to this case. Accordingly, we ignore Mr. Hansen's 1991 appraisal. However, we have used Hansen's appraisal of PCBCEO as of September 30, 1981, in the amount of $ 500,000 as a starting point for our analysis of the value of what was transferred to Patrick and Valerie Bruce. That appraisal was substantially contemporaneous with the July 1, 1982, transaction date. It was done for other purposes, i.e., decedent's divorce from her second husband and, after consideration of the entire record, the *262 Court has concluded that the $ 500,000 figure is a substantially justified starting place for considering the value of what was transferred to Patrick and Valerie Bruce. Once again we must advise counsel that valuation cases such as this are better suited for the give and take of the settlement process than adjudication. See Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 451 (1980); Messing v. Commission, 48 T.C. 502, 512 (1967). It is quite clear from the record that the experts have not been permitted to meet to discuss their reports and attempt to resolve their differences. Even if the latter were not possible, it would have been helpful if the two experts were on the same wave length. It is also noted that petitioner's counsel refused to allow respondent's expert an opportunity to visit PCBCEO's warehouse and bottling plant. To the extent that this reflects counsel's attitude and approach towards Tax Court litigation, the Court suggests that this is not the way we conduct proceedings. Furthermore, the Court concludes that counsel have failed to meaningfully confer with each other regarding *263 settlement and stipulation as required by the Court's Standing Pre-trial Order. The result of this "Rambo" approach to Tax Court litigation is that the parties and the Court have had to spend considerable time and effort in trial, on briefs, and in opinion writing to resolve a question which clearly should have been settled. Decisions will be entered under Rule 155
Footnotes
1. Petitioner asserts that the combined fair market value of the note given by Patrick and Valerie Bruce (face amount of $ 26,451.85), and the PCBCEO redemption note (face amount of $ 644,679), was $ 305,000 on July 1, 1982. Respondent accepts this value "In order to allow the Court to focus on the value of PCBCEO on July 1, 1982".↩