ROBERT B. FISKE AND JANET T. FISKE, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Fiske v. Commissioner
Docket Nos. 4353-81, 4354-81, 4355-81.
United States Tax Court
T.C. Memo 1984-494; 1984 Tax Ct. Memo LEXIS 176; 48 T.C.M. (CCH) 1128; T.C.M. (RIA) 84494; September 17, 1984. Robert E. Crotty,Paul R. Brenner, and Debra M. Aaron for the petitioners. Alan H. Kaufman and Jody Tancer, for the respondent. TANNENWALD MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined *177 the following deficiencies in petitioners' Federal income tax: Petitioners
Docket No.
Year
Deficiency
Robert B. Fiske and
4353-81
1976
$ 8,001.00
Janet T. Fiske
1977
12,101.00
Paul C. Sheeline and
4354-81
1976
2,175.20
Sandra W. Sheeline
Mary H. Lambert and
4355-81
1976
18,185.00
Estate of Samuel
1977
7,582.00
W. Lambert, Jr.,
Deceased, Samuel
W. Lambert, III,
Charles F. Morgan
and United States
Trust Company of
New York, Executors
After concessions, the sole issue for decision is the value of certain land donated to a charitable organization. For reasons of convenience, we have combined our findings of fact and opinion. Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Robert B. Fiske and Janet T. Fiske resided in Darien, Conn., when they filed their petition herein. Petitioners Paul C. Sheeline and Sandra W. Sheeline resided in Lloyd Harbor, N.Y., when they filed their petition herein. Petitioners Mary H. Lambert and Estate of Samuel W. Lambert, Jr., [2] resided in Princeton, N.J., *178 when they filed their petition herein. Robert B. Fiske, Paul C. Sheeline, and Samuel W. Lambert, Jr. (hereinafter the petitioners), along with twenty-two others, were members ofthe Balsam Lake Club (BLC), a New York corporation, which owned, prior to April 22, 1976, approximately 3,753 acres of land in Hardenburgh, Ulster County, N.Y. On April 22, 1976, the BLC transferred certain parcels of its land to two members and distributed an undivided 1/25th fee interest in the remaining 3,732.5 acres to each of its members in liquidation under section 333. [3] On the same date, the 25 former BLC members, as tenants-in-common, conveyed approximately 145 acres of the property to the Balsam Lake Anglers Club (BLAC), a partnership in which each former BLC member was apparently a partner. The remaining 3,587.5 acres were conveyed by gift, on the same date, by the former BLC members, to *179 the Catskill Center for Conservation and Development, Inc. (CCCD), a section 501(c)(3) organization that was not, pursuant to section 509(a), a private foundation. The deed of the 145 acres to the BLAC provided in part that: EXCEPTING AND RESERVING for the benefit of the parties of the first part and their heirs, successors and assigns and the balance of the land conveyed by the aforementioned deed from [BLC] to the parties of the first part, which is intended to be conveyed by the parties of the first part to [CCCD] (the "adjoining land"), the right and easement to use the premises hereby conveyed with the exception of PARCEL B [land on which the Balsam Lake Club House was located] for ingress and egress to and from the adjoining land, for forestry and wildlife management on the adjoining land including the removal of timber from and hunting upon the adjoining land, and for conservation, scientific and educational purposes with respect *180 to the premises conveyed hereby and the adjoining land, provided that the exercise of such rights shall neither injure the premises conveyed hereby nor injure or threaten the ecological balance, indigenous wildlife or scenic values of said premises or the adjoining land nor interfere with the use and enjoyment of said premises by the party of the second part or its successors or assigns. Said right and easement shall not include the right to create public trails across the premises hereby conveyed or to permit public trails across said premises other than presently existing public trails. It is understood that the adjoining lands are intended to be conveyed forthwith to [CCCD], at which time the aforesaid right and easement shall be for the benefit of said adjoining lands and [CCCD] and its successors and assigns and for the agents of said Center and hunters holding written permits from said Center or the successors or assigns of said Center. TO HAVE AND TO HOLD the premises herein granted unto the party of the second part and the successors and assigns of the party of the second part forever. The party of the second part for itself and its successors and assigns hereby covenants *181 with the parties of the first part and their heirs, successors and assigns that no buildings or new roads, other than presently existing buildings and roads, shall be erected, placed or permitted on the premises hereby conveyed with the exception of the above PARCEL B, and said premises shall not be developed so as to interfere with the natural state and condition of the land; provided, however, that buildings and roads presently on said premises may be repaired or, if destroyed, replaced by buildings or roads of a comparable size and character. The party of the second part for itself and its successors and assigns further covenants that the Balsam Lake Club House shall not be extended or expanded to a size greater than one and one-half times its present size nor replaced by a building greater than one and one-half times the present size of the Balsam Lake Club House, and that the above PARCEL B shall not be used for commercial hotel or boarding house purposes open to the general public. The rights, easements and restrictions created herein are to and shall run with the land and shall be for the benefit of the adjoining land as hereinabove defined and the parties of the first part *182 and their heirs, successors and assigns, any of whom may institute and prosecute any proceedings at law or in equity against the person or persons violating or threatening to violate the same. The deed of the 3,587.5 acrestothe CCCD states that certain properties formerly owned by the BLC were transferred to, inter alia, the BLAC and that the deed to the BLAC "is intended to be recorded prior to this deed." No restrictions on the CCDD's use of the property are placed in the deed to it. However, on the same date the deeds herein were executed, the former members of the BLC and the CCCD entered into an unrecorded "Statement of Understanding and Intent," which provided in pertinent part that-- 1. The parties intend to use their properties so as to conserve, protect and enhance the ecological balance, indigenous wildlife and scenic values of their properties and the surrounding region. With respect to the Center, these objectives are more fully set forth in its Certificate of Incorporation. To this end, the parties intend to cooperate in the use of their respective properties for research, scientific, and educational purposes. It is their intent to mutually collect information *183 with respect to the Beaver Kill River, including its sources, and data such as quantity of flow, temperature and identification and number of species. In no event, however, shall such research interfere with [BLAC's] intended normal use of its property, including but not limited to fishing and stocking the River. In addition, the parties intend to cooperate for research, scientific and educational purposes to inventory the indigenous flora and fauna on their properties and to utilize their properties so as to advance their mutual objectives with respect to the balanced use, enhancement and conservation of their respective properties.With respect to the Center these objectives are fully set forth in their Certificate of Incorporation and in particular in Article SECOND, paragraphs a. through e. thereof. * * * 3. The parties recognize that public access to their properties substantially in excess of that formerly permitted by [BLC] might imperil the ecology, wildlife and scenic values of the properties and region, and present substantial administrative difficulties and expense. The parties plan to grant such public access only to the extent consistent with the conservation *184 objectives expressed in paragraph 1. Either party, if desirous of creating any new trails open to the public, agrees to consult with the other with respect thereto so as to minimize any administrative or environmental problems and any interference with the normal use by the parties of their respective properties which might be associated therewith. * * * 8. It is in the mutual interest of the parties to keep each other informed with respect to the use, management and operation of their respective properties, and in particular with respect to the matters specified herein. The word "consult" as used herein, implies the desirability of such communication as well as the further desirability of discussing proposed changes or actions which the parties might be considering which could have an impact on the other party or the use and enjoyment of the other party's property by it, prior to implementing or acting with respect to such a proposal.It is however, understood that each party, following such discussion and consideration, shall be free to act as it may deem necessary, subject only to the terms and conditions of the respective deeds to its property. Hardenburgh is located in *185 the extreme northwestern part of Ulster County, in the Catskill Mountains, approximately 140 miles from New York City. The highway that connects Hardenburgh with New York City is to the south and west of the town. The area around Hardenburgh is very mountainous and remote. The nearest shopping of any sort, including a supermarket, is located in Livingston Manor, approximately a half-hour's drive in good weather from the donated property. Hardenburgh itself has no business that can be considered a potential employer. The population of Hardenburgh was 239 in 1970, down 5.2 percent from 252 in 1960. Of the 124 housing units in Hardenburgh in 1970, 54 are seasonally occupied. The Catskill Mountains provide numerous recreational opportunities, including hiking, fishing, and skiing, for yearly, seasonal, and weekend residents. Resorts are located in different parts of the region. Hardenburgh is not very close to any of those resorts. Consequently, seasonal and weekend residents seeking to participate in recreational activities, etc., at these resorts, are less interested in living in Hardenburgh than persons interested in hiking or fishing. The donated property is nestled *186 in the mountains to the east of the actual town of Hardenburgh. Turnwood Road, which connects the donated property with Hardenburgh, is a dirt road as it runs approximately one-half of the way into the donated property. No road access exists to the remainder of the donated property.Beaver Kill River, a world-renowned trout stream, runs through the donated property from east to west. The donated property is composed of two parcels of land. The larger parcel, which is shaped irregularly (fairly long and narrow) runs for over five miles parallel but not adjacent to and on both sides of the Beaver Kill River. The second parcel is rectangle-shaped, contains Balsam Lake, and lies to the north of the first parcel. Turnwood Road runs from the first parcel, through state land, into the second parcel. The property donated to the CCCD does not contain several amenities formerly owned by the BLC. Those amenities, including the Beaver Kill River andsome land on either side, Balsam Lake, the BLC Clubhouse, Vly Pond, and the Claryville Trail, were part of the 145 acres transferred by the former BLC members to the BLAC. The donated property does contain part of Tunis Pond as well *187 as a few small streams that flow into the Beaver Kill River. The owners of the donated property were not given the right to fish in waters, including the famous Beaver Kill River as it runs along this property, owned by the BLAC (which, as its name implies, was a fishing club). Although some of the property near the Beaver Kill River is flat, open meadowland, the property is, for the most part, quite mountainous. Ninety to ninety-five percent of the donated property is wooded. The land to the south of the river has no direct road access. Petitioners contend that the fair market value of the donated property was, at the time of the gift, $1,700,000 (approximately $476 per acre). Respondent's deficiency notice valued the property at $805,500 (approximately $225 per acre) less $120,825 for a 15-percent fractional-interest discount, or $684,675 (approximately $191 per acre). On brief, respondent concedes that a fractional interest discount does not apply but contends that the property's value was $717,500 ($200 per acre). In 1977, the CCCD sold 196.56 acres of the donated property which were remote and fairly mountainous to the state for $55,000 ($279.81 per acre average. In 1979, *188 the CCCD sold all their remaining property, less 5.79 acres, [4] to the state for $765,000 (approximately $225 per acre). The fair market value of property as of a given date is a question of fact. Jarre v. Commissioner,64 T.C. 183, 188 (1975). Petitioners have the burden of proving that the fair market value of the donated property exceeds the value determined by respondent in his notice of deficiency. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Numerous appraisals were submitted into evidence at trial. Petitioners rely primarily on appraisals by D.J. Bettinger and Walter Donnaruma. Bettinger, who was retained by the former members of the BLC to appraise the property for their tax returns, utilized a "before and after" appraisal approach whereby he valued the BLC property in the hands of its 25 members and then *189 subtracted from that figure the value of the property not transferred to the CCCD (i.e., the BLAC property). Bettinger's original appraisal (completed on October 1, 1976) valued the BLAC property at $100,000 and the donated property at $1,625,000 (or $433 per acre based on an assumed acreage of 3,755 acres). On January 31, 1977, Bettinger increased the appraised value of the donated property to $1,700,000 (approximately $453 per acre also based on an assumed acreage of 3,755 acres). However, since Bettinger's calculations were based on an improper acreage figure, Bettinger's second appraisal, as adjusted, was approximately $1,625,000. [5] Bettinger's appraisals were based on parcelizing the donated property according to its highest and best use. Three different highest and best uses were found. Bettinger originally appraised the approximately 450 acres of "Type A" -- "prime residential development land" -- at $1,500 per acre, the approximately 1,000 acres of "Type B" -- "potential development and/or highly usable recreational land" -- at $500 per acre, and the approximately 2,450 acres of "Type C" -- "pure recreational land" -- at $225 per acre (total of $1,725,000, *190 less $100,000, or $1,625,000). Bettinger's second appraisal did not indicate price per acre for each type of property. [6]
Walter Donnaruma was retained by petitioners in 1982 to appraise the property. Donnaruma determined that the fair market value of the donated property (which he assumed contained 3,737 acres as of April 22, 1976, was $1,800,000 (or $481.67 per acre); the adjusted figure for 3,587.5 acres is $1,727,991. Donnaruma, like Bettinger, determined that the numerous good building sites were located along Turnwood Road and that the property was located in an area that "has had serious attraction to wealthy investors who desire to own large tracts of forest land."In short, Donnaruma felt that vacation homes could be built on some of the land. Respondent relies primarily on the appraisals of Leland T. Bookhout and Gerald Griffin, Jr. Bookhout was retained by *191 respondent in 1982. Bookhout determined that the highest and best use of the donated property was for recreation and timber production and valued the property (which he assumed contained 3,581.4 acres) as of April 22, 1976, at $716,500 (approximately $200 per acre); the adjusted figure for 3,587.5 acres is approximately $717,500. Bookhout acknowledged that some of the property along Turnwood Road could be used for pasture purposes; however, he stated that "[r]esidential development is hindered by periodic flooding of the flatland but mainly in 1976 it suffers from lack of demand." According to Bookhout, the real estate market in the vicinity of Hardenburgh took an adverse turn in the spring of 1974, worsened until it bottomed out in mid-to-late 1976 and held fairly static through the following two years. Gerald Griffin, Jr., was retained by the New York State Department of Environmental Conservation to appraise the CCCD property in connection with the state's acquisition thereof.Griffin determined that on December 2, 1977, 3,580 acres of CCCD property had a fair market value of $805,500 ($225 per acre). Griffin determined that the property's highest and best use was *192 recreational. Several other appraisals were also submitted into evidence. Bernard J. Fountain, who was retained by the state at the same time that Griffin was, valued 3,580 acres of the CCCD property, as of November 30, 1977, at $1,163,500 (or $325 per acre). Jonathan R. Crossley, who was retained by the BLC in connection with litigation over real property tax assessments by the Town of Hardenburgh, determined that, during 1975, the BLC property (including Balsam Lake, Beaver Kill River, etc., but excluding the various buildings) had a fair market value of $371,987 (approximately $100 per acre). Albert M. Voss, the Town of Hardenburgh Assessor, determined that, in 1974, the BLC property (including Balsam Lake, Beaver Kill River, etc., but excluding the various buildings) had a fair market value of $1,426,870 (approximately $345 per acre). Roger M. Darby, who was retained by the Town of Hardenburgh to appraise the CCCD property, determined that 3,581.4 acres of this property had a fair market value, as of May 1, 1977, of $1,543,100 (or $430.87 per acre). Neither Fountain, Crossley, Voss, nor Darby testified at the trial. Each of the parties herein has presented numerous arguments *193 as to why the other side's experts' valuation reports should be ignored and why his side's valuation reports are reliable. For example, many arguments are advanced as to whether various sales evaluated by the experts were in fact "comparable" to the donated property. Similarly, respondent argues at length that Bettinger's "before and after" valuation approach is invalid in this case. Arguments were also advanced concerning the proper way to value property which contains parcels having different highest and best uses. Although we have taken all of these arguments into account in evaluating the record herein in order to reach our ultimate determination of value, we find it unnecessary to detail the manner in which each and every argument entered into our cerebrations. We have distilled those arguments which we think properly deserve articulation. The first question is whether we should value the property in the hands of the petitioners and the other 22 former BLC members or the property the CCCD actually received. Petitioners argue, quite strenuously, that we must determine the value of the donated property by looking at what the former BLC members could have done with *194 it. Specifically, petitioners contend that, since there was no barrier to their developing the property, we cannot consider any possible barrier to the CCCD's developing the property. We cannot agree. The regulations under section 170 state that the amount of a charitable contribution of property other than money is the "fair market value" of the property. Section 1.170A-1(c)(1), Income Tax Regs. "Fair market value" is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." Section 1.170A-1(c)(2), Income Tax Regs.
We think the relevant facts include taking into account what is expected to happen to the donated property at or about the time of the donation. In this context, it is clear to us that the use of large portions of the donated property would be seriously impaired because of lack of access and that this lack of access must be taken into account in determining *195 the fair market value of the donated property. In this connection, we think petitioners' reliance on the fact that the deed to the CCCD contained no restrictions is misplaced. In point of fact, the deed to the BLAC referred to rights reserved in favor of the CCCD and specifically stated that it was to be recorded prior to the deed to the CCCD, and the "Statement of Understanding and Intent" between the former members of the BLC and the CCCD bears the same date as each of the deeds. But aside from any technicalities arising out of timing, or whether the instruments created legally binding obligations (see n. 7, infra.) it is obvious to us that these arrangementswere part and parcel of the entire transaction as contemplated by the donors and the restrictions (particularly as to access) and their impact [7] constituted relevant facts which would cause any prospective purchaser to lower the price he would otherwise be prepared to pay. Petitioners' position is preposterous. In effect, it says that a seller of property can say to a buyer "You must pay a price as though there were full access to the property although I plan to fix things so that no such access will exist. *196 " We conclude that in valuing the donated property, available access must be considered. The cases cited by petitioners are inapposite. The various experts herein seem to agree that the fair market value of recreational property in Hardenburgh in the mid-1970's was in the neighborhood of $200-$225 per acre. [8] Therefore, the critical questions are what potential there was for developing howmuch of the donated property and what effect this factor should have on the property's value. *197 Initially, we not that much of the donated property which Bettinger described as Type A or Type B property is not as accessible as Bettinger would have us believe. For example, the only direct access to the property south of the Beaver Kill River is over the river. However, the deed of this property to the BLAC permits the CCCD access across the river only for "forestry and wildlife management * * * and for conservation, scientific and educational purposes * * * [and] said right and easement shall not include the right to create public trails." Consequently, it is clear that the land south of the river could not properly be described as either "prime residential development land" or "potential development and/or highly usable recreational land." [9] The property between the Claryville Trail and the Beaver Kill River suffers from the same restrictions. [10] Furthermore, none of the land north of the Claryville Trail was accessible, in 1976, by any route other than the Claryville Trail. Hence, before any of this property could possibly be developed, Turnwood Road would have to be extended at a developer's expense. *198 Although the major portion of the donated property was not physically capable of being developed because of lack of access, the land along Turnwood Road [11] had some potential for development. [12] But such potential cannot be remote, speculative, or conjectural. See Olson v. United States,292 U.S. 246, 257 (1934); Crock v. Commissioner,T.C. Memo. 1983-351. Respondent's experts testified that demand for vacation homes was very sluggish in 1976, while petitioners' experts found a stronger demand for such homes around Hardenburgh. Since much of the desired land around Hardenburgh was held by wealthy individuals who did not wish to break up their lands, little land in Hardenburgh had been sold in decades. After carefully considering the record herein, we find that with respect to approximately 1,000 acres there was some potential demand for fairly large tracts of land (50 to 100 acres) [13] on which to build vacation homes. Consequently, we believe that the donated property had a value somewhat above its value for pure recreational/timber production *199 land, but we are not persuaded that the potential demand, although foreseeable, had any significant immediate strength. Valuing land is an exercise which defies talismanic precision. The best we can do is make an educated guess. See Messing v. Commissioner,48 T.C. 502, 512 (1967). [14] For this reason, we repeatedly suggested to the parties herein that this case be settled. Our exhortations were without avail. Although we believe that neither party's experts gave the appropriate consideration to the amount of property capable of any development and the demand therefor, on the whole we find that respondent's witnesses, Bookhout and Griffin, were far closer to the mark. [15] See Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441, 452 (1980). *200 Based on our evaluation of the record as a whole, we find and hold that 1,000 acres of the donated property had some value reflecting a use beyond that for recreation and timber production and should be valued at $400 per acre and that the remaining 2587.5 acres should be valued at $225 per acre reflecting their use for recreation and timber production, or an aggregate value of $982,187.50 for the donated property. Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Paul C. Sheeline and Sandra W. Sheeline, docket No. 4354-81; Mary H. Lambert and Estate of Samuel W. Lambert, Jr., Deceased, Samuel W. Lambert, III, Charles F. Morgan and United States Trust Company of New York, Executors, docket No. 4355-81.↩
2. Samuel W. Lambert, Jr., died on May 11, 1977. The Superior Court of New Jersey, Chancery Division, County of Mercer, issued letters testamentary with respect to Lambert's estate to Samuel W. Lambert, III, Charles F. Morgan, and the United States Trust Company of New York on May 24, 1977.↩
3. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
4. In 1978, the CCCD exchanged with the BLAC approximately 20 acres of CCCD property for approximately 30 acres of BLAC property. Consequently, the total property sold to the state was approximately 3,395 acres.↩
5. On May 29, 1980, Bettinger again increased the appraised value of the donated property, this time to $1,750,000. ↩
6. Bettinger's third appraisal valued Type A property at $1,000 per acre (down $500), Type B property at $850 per acre (up $350), and Type C property at $225 per acre (no change).↩
7. Petitioners argue that the "Statement of Understanding and Intent" had no binding legal effect. However, any prospective purchaser would have considered that its terms contained the seeds of a lawsuit which he might have to defend, albeit possibly successfully.↩
8. Bookhout found that the fair market value of the property was $200 per acre. He determined that the property's highest and best use was for recreation and timber production, although he testified that he took into account the possibility that some 1,000 acres might have some long-range potential for property, which had a highest and best use as recreational property, was $225 per acre. Bettinger found that his "Type C -- pure recreational land" was $225 per acre. As our ultimate decision reveals, we accept the higher figure. See pp. 18-19, infra.↩
9. Indeed, Bettinger's appraisal report states that "access to the southerly portion of the property which is quite mountainous is physically difficult." Donnaruma did not find any of the land south of the river suitable for development. ↩
10. It is possible that some of the land near where the Claryville Trail meets Turnwood Road could have been reached without crossing the BLAC's property along either the Claryville Trail or the Beaver Kill River. However, the amount, if any, of such land would be quite minimal.↩
11. Electric and telephone facilities were available in 1976 along Turnwood Road. ↩
12. Some of the land near Balsam Lake, at the terminus of Turnwood Road, was also physically capable of being developed. ↩
13. Bettinger testified that his "Type B" property could be sold in 50- to 100-acre lots.↩
14. See also, Flamm v. Commissioner,T.C. Memo. 1969-287; Estate of Mitchell v. Commissioner,T.C. Memo. 1968-297↩. 15. Bettinger and Donnaruma placed far too much emphasis on the potential for developing the property into small lots. Moreover, many of Donnaruma's comparables were sales from persons whose homes were not on the market when the buyer approached them. Hence, many of those sales reflect a premium price. Bookhout and Griffin, on the other hand, placed too little emphasis on the potential of selling off some fairly large lots for seasonal homes. However, Bookhout, and perhaps Griffin, did at least take this potential into account.↩